**Félix E.F. LAROCCA, M.D.,**
**Plaintiff–Appellant,**

v.

**STATE BOARD OF REGISTRATION**
**FOR the HEALING ARTS,**
**Defendant–Respondent.**

No. 65897.

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 21, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 12, 1995.

Application to Transfer Denied
May 30, 1995.

38

Merle L. Silverstein, Richard E. Greenberg, Rosenblum, Goldenhersh, Silverstein & Zafft, P.C., Clayton, for appellant.

Peter J. Dunne, Rabbitt, Pitzer & Snodgrass, St. Louis, for respondent.

SIMON, Judge.

Plaintiff Dr. Félix E.F. Larocca (Doctor) appeals from the judgment of the trial court affirming the decision of the Board of Registration for the Healing Arts (Board) revoking Doctor's license to practice medicine in Missouri. The Board took action pursuant to the conclusion of the Administrative Hearing Commission (AHC), which found "cause to discipline [Doctor]'s license" after a hearing on the matter. On appeal, Doctor contends that the trial court erred in: (1) overruling his motion for summary judgment and affirming the Board's action because of "the excessive and inexcusable delay of more than five years, from the time the Board was informed of the alleged misconduct and began its investigation until it filed a complaint and first informed [Doctor] of the specific charges," which constituted both a violation of Doctor's due process rights and laches; and (2) affirming the decision of the Board and the AHC because it was not supported by competent and substantial evidence. We affirm.

Our review is of the AHC's decision rather than that of the circuit court. *Francois v. State Bd. of Registration for the Healing Arts*, 880 S.W.2d 601, 602 (Mo.App.E.D. 1994). We treat the decision of the AHC and the disciplinary order of the Board as one decision and as the final decision of the AHC subject to review. *Perez v. Missouri State Bd. of Registration for the Healing Arts*, 803 S.W.2d 160, 162[1] (Mo.App.1991). We view the evidence and all reasonable inferences therefrom in the light most favorable to the findings and decision. *Id.* at 162[2].

Doctor was board-certified in both adult and child psychiatry, specializing in the treatment of eating disorders. He lectured on the subject worldwide during the 1970s and 1980s. In St. Louis, Doctor organized groups known as "BAN," for bulimia/anorexia nervosa, and "BASH," for bulimia/anorexia self-help, which met regularly with Doctor and in smaller groups led by patients called "facilitators." During 1983 and 1984, L.A. and G.D. were undergoing treatment with Doctor for eating disorders.

### I. L.A.

L.A. had been one of the earliest participants in the BASH program, becoming a facilitator when the program started in 1981. While a patient of Doctor from 1980 to 1984, L.A. developed an attraction to Doctor that began by seeing him as a father figure and later became a romantic and sexual attraction.

On August 23, 1983, after a facilitators' meeting, Doctor drove L.A., then age 18, to his home, purportedly to discuss her possible paid employment with BASH. While there, Doctor gave L.A. a beer and proceeded to hug and kiss her and to touch her breasts. She jumped back, confused. He asked her to allow him to photograph her in the nude. Shortly thereafter, Doctor invited her to sit on his lap, whereupon he put his hand between her legs and told her that he loved her. She insisted that he take her home, but as he was driving, he took her hand and placed it on his penis. Doctor started to drive back to his house, but L.A. repeatedly asked him to take her home, which he eventually did. At her home, her sister's boyfriend, who was married to her sister at the time of the hearing, saw them drive up together.

The next such incident between Doctor and L.A. occurred on December 19, 1983. Because it was snowing, Doctor drove L.A. to her car. Upon reaching her car, Doctor stopped and began to touch her breasts and tell her he loved her. L.A. was confused and frightened, and Doctor suggested they return to his office to discuss her feelings. However, the advances continued at his office, where Doctor again told L.A. he loved her and asked her to take off her clothes. She walked out into the reception area, and Doctor took her back to her car.

Doctor attempted to have sexual intercourse with L.A. twice in February of 1984. On February 21, at his office, Doctor laid on top of L.A. but was unable to penetrate her. On February 28, Doctor asked L.A. to come over to his house to discuss an upcoming trip by BASH members. When she arrived around 10:00 p.m., she waited for the lights in the house to flash off and on, his prearranged signal for her to come up to the house. That evening, they undressed in the living room and attempted to have sexual intercourse, again unsuccessfully. Doctor's wife and daughter were home at the time, but he told L.A. that they had gone to bed.

In March of 1984, L.A. traveled to San Diego, California, along with Doctor's wife and daughter, a friend of the daughter, and Julie LaRose (LaRose), another BASH speaker, for a BASH meeting. L.A. stayed with LaRose in a hotel for the first three days of her visit, March 8, 9, and 10, but when Doctor mentioned that they could stay in California for an extra day or two after the meeting, LaRose was unable to stay. After LaRose returned to St. Louis on March 11, L.A. stayed at Doctor's condominium with Doctor and the others; L.A. was to sleep on a cot in the living room area. That night, once everyone had gone to bed, Doctor came out to the living room where L.A. was sleeping, pulled down her pants, and asked her to "let [him penetrate her] a few inches." He continued for five to ten minutes, but he stopped because L.A. protested that it hurt her. L.A. left California the next day.

The first time Doctor and L.A. actually had sexual intercourse occurred in his bedroom on March 16, 1984, the night he returned from California. L.A. had picked up Doctor at the airport; his family remained in California for a few more days. Doctor asked L.A. to stay at his house again the next night. When she left Doctor's house on the night of the 16th, her car became stuck in the mud on Doctor's lawn. L.A.'s father had to come to pick her up, and her car was towed out of the lawn the next day.

L.A. and Doctor had sexual intercourse several more times during the next five months. On March 17, 1984, the night after her car became stuck in the mud, L.A. was driven by a friend to Doctor's house, where they engaged in sexual intercourse. She spent the night, and left the next morning at Doctor's request by the basement door, crossing a couple of neighbors' lawns to another street, where Doctor picked her up and took her home. They again had sexual intercourse on March 21, 1984, at Doctor's house, while his family was still in California. They had sexual intercourse twice in April of 1984, both times in the basement of Doctor's house. On May 2–4, 1984, L.A. accompanied Doctor to Chicago, where he was attending a medical conference. They stayed in the same room at the Drake Hotel, and they had sexual intercourse there several times. On May 17, 1984, they had sexual intercourse in the basement of Doctor's house. On May 20, 1984, while Doctor's wife and daughter were

picking up Doctor's son at college in Iowa, L.A. and Doctor had sexual intercourse at Doctor's house. They also had sex twice in June of 1984 at Doctor's house.

During that month, L.A. became involved in a dating relationship with another man, and she started refusing Doctor's advances. However, on July 4, 1984, Doctor seduced L.A. at his house. Shortly thereafter, when she told Doctor of her decision to stop seeing him, Doctor terminated and denied ever authorizing a film project on eating disorders that L.A. had been working on for several months. She felt devastated and betrayed.

L.A. ended the relationship and stopped working for BASH in August of 1984, when she learned that Doctor had been engaging in sexual relations with G.D., L.A.'s roommate at the time.

## II. G.D.

G.D. began seeing Doctor as a patient in January of 1982, when she was 17 years old. Originally, Doctor saw her on an inpatient basis, but when she was discharged from the hospital in March, she began to visit his office once a week for therapy. At his request, G.D. began attending BAN and BASH meetings as part of her treatment. She continued under Doctor's care through 1982 and 1983, during which time she was hospitalized on two additional occasions for a total of about four months.

On September 6, 1983, G.D., two weeks shy of her nineteenth birthday, became upset after an argument with her mother. Her mother had gone to a friend's house, and G.D. tried to talk to her there. Upset that her mother refused to see her, G.D. deliberately backed her car into the friend's garage door. Her mother called G.D.'s father, who called Doctor. Doctor arrived at G.D.'s house, to which she had returned, and suggested that she stay at his house for the night. Doctor called his wife and informed her of the arrangement, and she assented. G.D. packed some things, hugged her father, and left with Doctor in his car.

Doctor took G.D. in the opposite direction of his house. During the ride, he began to touch her breasts and put his hand in her pants, telling her that he was trying to help her feel comfortable with her body. G.D. was shocked, and she could not believe what was happening to her. After about twenty minutes, they reached Doctor's house, and G.D. agreed to talk with Doctor in his study.

Doctor's wife greeted them at the door, and Doctor told G.D. to put her things in an upstairs bedroom. She then went downstairs to the study, and she began to discuss the evening's events with him. He asked her to kiss him, and she did. He took down his pants and had G.D. touch him. Doctor asked G.D. to take down her pants, which she did because she trusted him. He told her that she looked tired, and she proceeded to her bedroom.

While she was sitting on the bed, thinking about what had happened in the study, Doctor entered the room wearing a robe. He told her she was beautiful, and asked her to undress in front of a full-length mirror. When she did so, he asked her to come back and sit on the bed, where he knelt in front of her, took down his underpants and asked her to touch him. She did so, but she refused his request for oral sex. He began to kiss her and to perform oral sex on her for a short time, telling her that he loved her like a daughter.

The next morning, Doctor asked G.D. if they were still friends, and she said they were. Doctor asked her if she wanted to keep her appointment with him that day, and she said she did. Later, Doctor's wife fixed breakfast for G.D. and drove her to Doctor's office. G.D. did not talk with Doctor about the events of the previous night, and she was unable to do so until three weeks later. He said that although he was her doctor, he also had feelings for her as a man, and that it would never happen again. She continued to visit Doctor for weekly therapy sessions.

On January 13, 1984, Doctor called G.D. to say he was going to come to her house. G.D. called her brother at her father's house and told him not to come over. When Doctor arrived, he sat on the couch in the family room and asked G.D. to sit on his lap, which she did. He asked her to kiss him and to take her clothes off, both of which she did. As he began to fondle her, G.D.'s father and

brother entered the house and saw her naked. G.D. testified that she jumped off Doctor's lap, and her father and brother testified that they saw her get up and run into a nearby bedroom, where she put on a bathrobe before returning to the family room. Doctor asked her to say hello to her father, but she said nothing. After a few moments, she went back to the bedroom to get dressed. She returned to the family room, but her father already had left. He went to a local shopping center and called his therapist, who had recommended Doctor to him. The therapist advised him to return home right away and stay there. By the time he arrived home, G.D. and Doctor were gone.

Doctor asked G.D. to go to his office with him, and she agreed. Before leaving, G.D. went to her brother's room to tell him where she was going, but before he could say anything about what he had seen, G.D. told him to "leave it alone."

On the way to his office, Doctor kept his hand in G.D.'s pants and had her touch his penis. They attempted to have sexual intercourse at his office, but it was too painful for G.D. She discussed the incident with her parents the next day. Her father threatened to confront Doctor about what had happened, but G.D. begged him not to do so and, to her knowledge, he never did. G.D.'s mother asked her to move out of the house, and she agreed.

Doctor and G.D. attempted to have sexual intercourse at his house on February 11 and 15, 1984, but were unsuccessful. On March 18, 19, and 20, 1984, G.D. spent the night with Doctor at his house, while his wife and daughter were in California. On each occasion, G.D. arrived at Doctor's darkened house in the evening, he met her at the door, they undressed and got into bed together. They successfully engaged in sexual intercourse on at least one of those occasions.

G.D. and Doctor had sexual intercourse at his house on June 19, 24, and 27; July 3, 9, 10, and 27; and August 10 and 21, 1984. The acts occurred in various rooms, but most of them took place on the living room floor. G.D. marked the specific dates of her sexual encounters with Doctor by overlining the date and marking a box around it on her calendar.

G.D. stopped seeing Doctor altogether a couple of days after she and L.A. discovered each other's involvement with him. However, G.D. spoke with Doctor by telephone in September of 1984. He told her that she was the only one with whom he had been having sex, that he had told his wife that L.A.'s allegations were false, and that G.D. did not make similar allegations against him. In the same call, G.D. spoke with Doctor's wife, who said she did not believe L.A.'s allegations.

In his first point, Doctor contends that the Board knew of the allegations against him and began its investigation more than five years before it first informed him of the charges, thereby committing (1) a violation of his due process rights and (2) laches. Doctor claims that, as a result of this delay, he lost contact with witnesses and access to evidence that might have assisted in his defense and that, based on his reasonable belief that no charges would be filed, he invested significant amounts of money and time in rebuilding his practice after it was damaged by adverse publicity.

■■■ Doctor's due process argument is that the delay "severely prejudiced [his] ability to defend himself" and therefore he was denied a fair hearing. In order to invoke the mandates of procedural due process, one must have been deprived of a property interest recognized and protected by the Due Process Clauses. *Moore v. Board of Educ.*, 836 S.W.2d 943, 947[1] (Mo. banc 1992), *cert. denied*, 507 U.S. ——, 113 S.Ct. 1270, 122 L.Ed.2d 666 (1993). Doctor had a property interest in his license to practice medicine protected by both procedural and substantive due process as prescribed in § 334.100, R.S.Mo.1994. Thus, Doctor was entitled to procedural due process before his license could be revoked. *See id.; Moore*, 836 S.W.2d at 947[2].

The Board filed its complaint with the AHC in accordance with § 334.100. Specifically, the Board found that Doctor violated § 334.100.2(5), R.S.Mo.Supp.1984, which was in effect at the time of the complaint:

2. The board may cause a complaint to be filed with the [AHC] as provided by chapter 621, RSMo, against any holder of any certificate of registration or authority, permit, or license required by this chapter or any person who has failed to renew or has surrendered his certificate of registration or authority, permit or license for any one or any combination of the following causes:

\* \* \* \* \* \*

(5) Incompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties of any profession licensed or regulated by this chapter[.]

Subsequently, the AHC conducted a hearing in accordance with § 621.045, R.S.Mo.1986, which reads in pertinent part:

1. The [AHC] shall conduct hearings and make findings of fact and conclusions of law in those cases wherein, under the law, a license issued by any of the following agencies may be revoked or suspended . . .:

\* \* \* \* \* \*

State Board of Registration for the Healing Arts

■ The Due Process Clauses require that in order to deprive a person of a property interest, the person must receive notice and an opportunity for a hearing appropriate to the nature of the case. *Moore*, 836 S.W.2d at 947[3]. Moreover, due process contemplates the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* at 947[4].

■ The specific dictates of due process are determined by balancing the competing interests at stake in the particular case: (1) the private interest that is affected by the administrative action; (2) the risk of an erroneous deprivation of this interest through the procedures used and the probable value of additional procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional procedural requirements would entail. *Belton v. Board of Police Comm'rs,* 708 S.W.2d 131, 137[8] (Mo.

banc 1986) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903[6], 47 L.Ed.2d 18, 33[14] (1976)).

With regard to the first factor, the private interest affected here is concededly significant, namely, Doctor's license to practice medicine in Missouri. We deem the risk of an erroneous deprivation of that interest slight, given the evidence against Doctor at the hearing and the lack of any specific proof that substantial exculpatory evidence was lost as a result of the delay. As for the third factor, we find that the state's vital interest in safeguarding the public health and welfare, which is the primary purpose of statutes authorizing the Board to discipline a physician's license, *see Missouri Bd. of Registration for the Healing Arts v. Levine,* 808 S.W.2d 440, 442[4] (Mo.App.1991), clearly outweighs the private property interest of Doctor in his license. Therefore, the *Mathews–Belton* balancing test favors the Board here.

■ Neither § 334.100 nor § 621.045 provides for a time period within which the Board must file its complaint or the AHC must hold a hearing. Our Supreme Court's statement thirty years ago applies with equal force here:

[The Board] has complied with the requirements of the law in that it initiated a complaint as authorized, gave written notice to the accused more than twenty days before the hearing date, which notice contained specifications of charges which the General Assembly has designated as causes for revocation, held a hearing pursuant to such notice, in which hearing evidence was taken and preserved, and made a determination as directed by the statute. The statute makes specific provision for judicial review of the proceedings and [Doctor] secured such review in the circuit court of the county of his residence. A previous statute from which [§ 334.100 is] derived, Section 7336, RSMo 1919, was applied to circumstances similar to this case, and the board revoked the license of a physician for a ground specified in the statute. The statute and procedure were held by the United States Supreme Court to afford due process, the court saying:

"The due process clause does not guarantee * * * any particular form or method of state procedure. Its requirements are satisfied if he has reasonable notice, and reasonable opportunity to be heard and to present his claim or defense, due regard being had to the nature of the proceedings and the character of the rights which may be affected by it. * * * The procedure authorized by [§ 334.100], as it was applied by the Board, satisfied those requirements[.]"

*Rose v. State Bd. of Registration for the Healing Arts,* 397 S.W.2d 570, 574[2] (Mo. 1965) (quoting *Missouri ex rel. Hurwitz v. North,* 271 U.S. 40, 42, 46 S.Ct. 384, 385[2], 70 L.Ed. 818, 821[4] (1926)). Moreover, proof of prejudice is required to show a denial of due process. *In re Jones,* 431 S.W.2d 809, 819[7] (Mo. banc 1966).

In support of his position that "a number of witnesses could no longer be located," Doctor submitted an affidavit to the AHC, which stated in pertinent part:

8. In addition, the Board's extremely deliberate approach to action against me, and its extremely late disclosure to me that such action was contemplated, have severely impaired my capacity to summon witnesses in my defense. Many have left the St. Louis area, or changed their name by marriage, and I do not have their current addresses. Some witnesses whom I would want my counsel to interview for eventual testimony in my behalf are:

[a]. Monica Santo, last known to be in Argentina (was in group meetings with the ... complainants);

[b]. Julie Tombridge, no current address, a patient of mine who was solicited to make a complaint against me;

[c]. Beth Hertzig, last known to be in Florida, a former patient who knew all three complainants well;

[d]. Adella Pizoit, no current address, who knew the complainants well and was aware of their plot;

[e]. Sandy Jansen, address unknown, perhaps on Okinawa; she publicly accused [G.D.] of lying.

Death has claimed another person, Maureen Lamb, who knew of the 1984 complainants' efforts to make a case against me. Another potential witness is my daughter, Paulina Larocca, who was with me on the California trip described by one of the 1984 complainants; Paulina now lives in western Australia and will have to travel more than 20,000 miles round trip to testify.

9. Besides the unavailability of some witnesses for me, and the distance that others will have to travel, the Board's inordinately slow procedure has made it difficult for any witness to recall in detail the events of more than six years ago.

While Doctor names several purportedly helpful witnesses, he fails to indicate what their testimony would be. We do not know what relevant information Santo, Tombridge and Hertzig would offer. Further, Doctor does not explain the "plot" about which Pizoit would testify; he does not state what lies purportedly would be revealed by Jansen's testimony; and he provides no information as to the nature of the testimony of Lamb and his daughter. We cannot presume that the testimony of the "lost" witnesses would corroborate Doctor's contention that he committed none of the acts of which he is accused. He has not shown what prejudice he suffered without the testimony of the named individuals.

With regard to his claims of lost evidence, Doctor offered one witness at the hearing, an interior designer, who testified that she discarded a date book which would have indicated that he was with her on the date of one of the alleged sexual incidents. Even if that were true, the accusations against him concerned activity on multiple dates. Proof that he did not commit sexual misconduct in one instance still would leave ample evidence and testimony supporting the Board's conclusion.

Other than his own affidavit and testimony, Doctor has offered nothing to demonstrate that he was prejudiced by the Board's delayed action. He actually has benefited from the delay, which deferred the revocation of his license. *See Panhandle Coop. Ass'n v. EPA,* 771 F.2d 1149, 1153 (8th Cir.

1985). We find no violation of Doctor's due process rights here.

Doctor also argues, however, that the Board's delay in informing him of the charges against him constituted laches, thereby invalidating the Board's action. Doctor may invoke laches only if he can prove that the Board had knowledge of the facts giving rise to its proceedings to revoke his license and it delayed the proceedings to the extent that Doctor suffered legal detriment. *See Perez,* 803 S.W.2d at 166[11]. Mere delay alone does not constitute laches. The delay must be unreasonable and unexplained and it must be accompanied by disadvantage and prejudice to Doctor. *See id.* at 166[12]. In order for laches to apply, the prejudice must fall into one of two categories: (1) loss of evidence that would support Doctor's position in defending against the Board's charges, or (2) a change of position by Doctor in a way that would not have occurred but for the delay. *See id.* at 166[13]. The party seeking to invoke laches carries the burden of proof. *Kimble v. Worth County R–III Bd. of Educ.,* 669 S.W.2d 949, 954[10] (Mo.App.1984).

Doctor makes essentially the same claims of prejudice to support his laches claim as in his due process claim, namely, that he no longer could locate helpful witnesses and that evidence had been lost. We fail to see how either assertion constitutes sufficient prejudice to invoke laches. Doctor offers no proof, other than his affidavit, that he could not locate helpful witnesses. Such a statement cannot rise to the level of prejudice necessary to invoke laches, particularly since "[e]quity does not encourage laches...." *Perez,* 803 S.W.2d at 166. Moreover, we cannot assume that witnesses' memories would have been more clear but for the delay. As for the investment in his practice, *Doctor* fails to show that such expenditures would not have occurred but for the delay. He emphasizes that the allegations against him received ample media publicity, which harmed his reputation and caused him to lose patients, yet he offers nothing to show that the expenditures, corroborated only by his affidavit, were increased by the delay. The money and time allegedly spent to restore his practice may have been responsive to the adverse publicity rather than the delay. We conclude that Doctor has failed to carry his burden to show prejudice supporting the invocation of laches.

Because of our finding that Doctor was not prejudiced by the delay, we need not address whether the delay was unreasonable and unexplained. In any event, we note that although we have questioned whether state government is immune from claims of laches, *see Scheble v. Missouri Clean Water Comm'n,* 734 S.W.2d 541, 560 (Mo.App.1987), the principle of sovereign immunity in such cases remains intact. *See Marion County v. Moffett,* 15 Mo. 604, 606 (1852). We will not overturn that principle here. Point denied.

Doctor contends in his second point that the AHC's decision was unsupported by competent and substantial evidence, was arbitrary and unreasonable, and was an abuse of discretion. Essentially, Doctor asks us to reverse the decision because the testimony of L.A. and G.D. was "uncorroborated and incredible" and the women were "mentally ill and disturbed."

The AHC explicitly found the testimony of L.A., G.D., and the others who corroborated their testimony to be more credible than that of Doctor. We may not substitute our judgment on the credibility of witnesses for that of the AHC. *State ex rel. Hall v. Wolf,* 710 S.W.2d 302, 304 (Mo.App. 1986). If the evidence before the AHC warrants either of two opposed findings, as here, we are bound by its findings. *Biggs v. Missouri Comm'n on Human Rights,* 830 S.W.2d 512, 518[10] (Mo.App.E.D.1992). Point denied.

Judgment affirmed.

AHRENS, P.J., and KAROHL, J., concur.