Lawrence E. **DORMAN,**
**D.O., Appellant,**

v.

**STATE BOARD OF REGISTRATION**
**FOR THE HEALING ARTS,**
**Respondent.**

**No. WD 58840.**

Missouri Court of Appeals,
Western District.

Oct. 9, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 4, 2001.

Application for Transfer Denied
Jan. 22, 2002.

**448**

Dennis J. Owens, Kansas City, for appellant.

Glenn E. Bradford, Kansas City, for respondent.

Before SPINDEN, P.J.,
BRECKENRIDGE and HOWARD, JJ.

PATRICIA BRECKENRIDGE, Judge.

The State Board of Registration for the Healing Arts (Board) revoked the medical license of Lawrence E. Dorman, D.O., after the Administrative Hearing Commission (Commission) found that Dr. Dorman's medical license was subject to disciplinary action for violation of §§ 334.100.2(4) and (5), and 334.100.2(4)(e), RSMo 2000.[1] The circuit court subsequently denied Dr. Dorman's petition for review, and affirmed the decisions of the Commission and the Board. Dr. Dorman appeals, claiming that the Commission's decision is not supported by substantial evidence because the Commission erroneously relied on hearsay evidence, and the decision involves an abuse of discretion because it is against the overwhelming weight of the evidence. Because this court finds that the Commission properly considered the hearsay

evidence in making its decision, and the decision is not against the weight of the evidence, the judgment of the circuit court affirming the decisions of the Commission and the Board is affirmed.

**Factual and Procedural Background**

■ In reviewing the sufficiency of the evidence to support the Commission's decision, this court views the evidence and any inferences therefrom in the light most favorable to the Commission's decision. *Larocca v. State Bd. of Registration for Healing Arts*, 897 S.W.2d 37, 39 (Mo.App. 1995).[2] The Commission's determination that Dr. Dorman's license is subject to discipline is based upon his treatment of one of his patients, E.F.S. In December 1988, E.F.S., who was 54 years old, sought treatment from Dr. Dorman. At that time, Dr. Dorman was a licensed osteopathic physician and surgeon who practiced primarily in the area of family medicine.

At E.F.S.'s first appointment with Dr. Dorman on December 9th, he complained of a sharp pain in his back that was radiating to his hands. E.F.S. told Dr. Dorman that he had been helping to remodel his church. Dr. Dorman ordered a blood test, but he did not perform a complete physical examination of E.F.S. The blood test results showed that E.F.S. had a relatively high cholesterol level. At that time, Dr. Dorman was also aware that E.F.S.'s father died of a heart attack when he was in his fifties, and that E.F.S. had a history of smoking. Dr. Dorman did not perform any tests to determine if E.F.S.'s problems were heart-related. Dr. Dorman diagnosed E.F.S. with a musculoskeletal problem.

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

2. This court will review evidence contrary to the Commission's decision when considering

Dr. Dorman's claim that the Commission abused its discretion because its decision is against the weight of the evidence.

Between December 13th and 18th, E.F.S. performed several physical tasks associated with the church remodeling, including lifting boxes, a heavy roll of carpeting, several boards, and piano dollies. On December 21st, E.F.S. woke up at 6:00 A.M. with a burning sensation in his chest, and a burning and stinging sensation in his back and arms. His chest was making a gurgling sound that his wife, B.R.S., was able to hear across the room. E.F.S. was in so much pain that he was crying.

E.F.S. and B.R.S. went to Dr. Dorman's office between 8:00 and 8:30 A.M. on December 21st and told Dr. Dorman about the symptoms E.F.S. had been having. Dr. Dorman checked E.F.S.'s blood pressure, which was significantly low. Dr. Dorman told B.R.S. that the low blood pressure was caused by the fact that E.F.S. was in a lot of pain, and that they should not worry about it. Dr. Dorman also performed an EKG on E.F.S., and told E.F.S. that the EKG "didn't look too bad." Dr. Dorman told E.F.S. and B.R.S. that the EKG showed that E.F.S. might have an aneurysm of the aorta, and if that was the case, there was no cure for it. Dr. Dorman told E.F.S. and B.R.S. that they needed to pray about it, because either the aneurysm would go away, or E.F.S. would die. Dr. Dorman gave E.F.S. a shot for the pain, put a hot pack on E.F.S.'s back, and gave him some samples of Isoptin. Isoptin is a calcium channel-blocking agent that is useful in preventing anginal episodes. The samples of Isoptin Dr. Dorman gave E.F.S., however, were past their expiration date.

E.F.S.'s condition did not improve after he left Dr. Dorman's office and, in fact, E.F.S. vomited repeatedly over the next 24 hours. E.F.S. made an appointment with his chiropractor, Dr. Wayne Bateman, for the afternoon of December 21st. Dr. Bateman performed an adjustment on E.F.S., and took x-rays of E.F.S.'s chest. Dr. Bateman told E.F.S. he did not like the way E.F.S.'s lungs looked on the x-ray, so Dr. Bateman took them to Dr. Ray Conley, a chiropractic radiologist, for evaluation. Dr. Conley noticed, among other things, that E.F.S.'s aortic knob was prominent, and he had aortic uncoiling. While these conditions can happen as a result of the aging process, they can also happen because of high blood pressure, atherosclerotic disease, and other changes in the vascular system. Dr. Conley believed that the conditions were unusual for a person of E.F.S.'s age.

The next day, when E.F.S. went back to Dr. Bateman for another adjustment, Dr. Bateman told E.F.S. that he and Dr. Conley recommended that E.F.S. obtain better chest x-rays. Dr. Bateman made an appointment for E.F.S to obtain more x-rays from Dr. Conley on December 23rd. E.F.S. was unable to keep that appointment, however, because he was nauseous.

Instead, E.F.S. went to Dr. Dorman's office on December 23rd and had Dr. Dorman evaluate the x-rays Dr. Bateman had taken. Dr. Dorman told E.F.S. and B.R.S. that the x-rays looked "like a lot to do about nothing." Dr. Dorman told them that E.F.S. did not need to obtain better chest x-rays. When B.R.S. told Dr. Dorman than E.F.S. had not eaten anything since December 20th, Dr. Dorman told B.R.S. not to worry about it, and that E.F.S. would eat when he wanted to.

Dr. Dorman's nurse then took E.F.S. into another room and began giving him intravenous hydrogen peroxide. While E.F.S. was receiving the hydrogen peroxide, B.R.S. asked Dr. Dorman about E.F.S. possibly having heart trouble. Dr. Dorman again told her that E.F.S. might have an aneurysm in his aorta. B.R.S. then asked Dr. Dorman what type of solution he was giving E.F.S. Dr. Dorman told B.R.S.

that he was administering intravenous hydrogen peroxide, but that he was putting on his chart that he was administering intravenous vitamin C. Dr. Dorman explained that the reason he was writing vitamin C on the chart was because he had signed a statement with the Board in Jefferson City in which he agreed not to treat patients with intravenous hydrogen peroxide anymore. Dr. Dorman said that the Board was ill-informed, however, and that intravenous hydrogen peroxide was a wonderful treatment. Dr. Dorman told B.R.S. that he had administered intravenous hydrogen peroxide to a woman with shingles ten days prior, and she had improved rapidly. Dr. Dorman told B.R.S. that intravenous hydrogen peroxide was the best treatment for E.F.S. B.R.S. and E.F.S. decided to proceed with the intravenous hydrogen peroxide treatment because Dr. Dorman said it would be all right.

By the next day, December 24th, E.F.S.'s condition still had not improved. E.F.S. called Dr. Dorman at his home, and then met him at his office. Dr. Dorman gave E.F.S. a shot to help his lung capacity because E.F.S. was having trouble breathing. Dr. Dorman gave him more Isoptin, and also gave him three other medications, one of which, Theo Dur, is contraindicated in acute myocardial infarction, or heart attack, cases. Dr. Dorman scheduled a follow-up appointment for E.F.S. to obtain another intravenous hydrogen peroxide treatment on December 27th.

E.F.S. went home after his appointment on December 24th and took the medication Dr. Dorman had prescribed. All of the medication made E.F.S.'s heart race rapidly, and E.F.S. became nauseous. Dr. Dorman called that evening and asked B.R.S. if she had given E.F.S. the prescribed medication. When B.R.S. told him why she had not, Dr. Dorman told B.R.S. to give E.F.S. as much of the medicine as possible. B.R.S. gave E.F.S. only half of the dosage. E.F.S. continued to feel worse after he took the medication.

Dr. Dorman called E.F.S.'s house two days later on December 26th. Dr. Dorman again asked B.R.S. if she had given E.F.S. the medicines he had prescribed, and B.R.S. again explained why she had not. E.F.S. complained that the medicine made him feel like he was going to die because he could not breathe, and it made him nauseous.

From December 26th to December 28th, E.F.S.'s condition appeared to be improving. On December 29th, however, E.F.S.'s condition worsened. B.R.S. contacted Dr. Gerald Lee, a physician she knew from church. Dr. Lee specializes in cardiovascular disease and internal medicine. B.R.S. told Dr. Lee that E.F.S. was having symptoms of chest pain and an inability to lie down because of shortness of breath. Dr. Lee told B.R.S. to take E.F.S. immediately to Dr. Said Mahmoud's office.

Dr. Mahmoud, who is a pulmonary specialist, performed an EKG on E.F.S., and showed the results to Dr. Jay Jackson, a cardiologist. Drs. Mahmoud and Jackson determined that E.F.S. had had a heart attack. Dr. Jackson opined that the heart attack had occurred anywhere from three to five days before December 29th. Both doctors told E.F.S. that he needed to be hospitalized immediately. According to Dr. Mahmoud, E.F.S. "did not have a clue" as to what was wrong with him, and was shocked to learn that he had had a heart attack. E.F.S. was taken by ambulance to the intensive care unit of Trinity Lutheran Hospital.

At the hospital, E.F.S. was diagnosed with pulmonary edema with congestive heart failure, cardiac enlargement, and marked increase in the bronchovascular markings of the lungs. Dr. Jackson treat-

ed E .F.S.'s heart condition with digitalis, diuretics, oxygen therapy, and IV nitroglycerin to make E.F.S. more comfortable and stable. The next day, Dr. Jackson performed a cardiac catheterization on E.F.S., which showed that E.F.S. had a totally obstructed left anterior descending, a dysfunctional left ventricle, and a possible aneurysm developing at the apex of his heart. On January 4, 1989, E .F.S. had a balloon angioplasty and angiogram that showed the clot on the inside of the left ventricle had been there for more than 24 hours.

E.F.S. stayed in the hospital for ten days before he was allowed to go home. According to B.R.S., E.F.S. never felt well again after being released from the hospital. On February 23, 1989, E.F.S. awoke feeling very bad. B.R.S. took E.F.S. to Dr. Lee, who immediately admitted E.F.S. to Trinity Lutheran. E.F.S. was intubated and placed on a ventilator. After E.F.S. and his family learned that E.F.S. had no chance of improving and would die within a matter of hours, E.F.S. requested that he be taken off of life support. E.F.S. died on February 24, 1989, from damage to his heart caused by acute myocardial infarction. Specifically, the official cause of his death was "cardiogenic shock due to advanced coronary artery disease with severe left ventricular dysfunction and multiple cardiac arrhythmias."

On December 11, 1996, the Board filed a complaint against Dr. Dorman in which it sought a determination from the Commission that the Board had cause to discipline Dr. Dorman's license. This complaint was amended on August 11, 1997. In its amended complaint, the Board pleaded eight counts for which it alleged cause existed to discipline Dr. Dorman's license. Two of these counts specifically related to Dr. Dorman's treatment of E.F.S.

In Count VI of the complaint, the Board alleged that there was cause to discipline Dr. Dorman's license for his treatment of E.F.S. under § 334.100.2(4) and (5), which allow for disciplining of medical licenses because of:

(4) Misconduct, fraud, misrepresentation, dishonesty, unethical conduct or unprofessional conduct in the performance of the functions or duties of any profession licensed or regulated by this chapter[;]

\* \* \*

(5) Any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public; or incompetency, gross negligence or repeated negligence in the performance of the functions or duties of any profession licensed or regulated by this chapter. For the purposes of this subdivision, "repeated negligence" means the failure, on more than one occasion, to use that degree of skill and learning ordinarily used under the same or similar circumstances by the member of the applicant's or licensee's profession;

The Board supported this count by citing several examples of what it contended were negligent acts of Dr. Dorman during his course of treatment of E.F.S.

In Count VII of the Board's complaint, the Board alleged that cause to discipline Dr. Dorman's license existed under § 334.100.2(4) and (4)(e). Section 334.100.2(4)(e) provides that cause for disciplining a license exists for "misrepresenting that any disease, ailment or infirmity can be cured by a method, procedure, treatment, medicine, or device[.]" In support of this count, the Board alleged that Dr. Dorman's unprofessional and unethical conduct of violating his written agreement with the Board to cease and desist treating

patients with intravenous hydrogen peroxide therapy constituted a misrepresentation to E.F.S. that his ailment could be cured by such treatment.

The Commission held a hearing on the Board's complaint in June 1998. On the issue of Dr. Dorman's treatment of E.F.S., the Board presented, among other evidence, the deposition testimony of B.R.S., E.F.S.'s widow. B.R.S. went to all of E.F.S.'s appointments with Dr. Dorman, and was in the room with E.F.S. and Dr. Dorman at all times except when Dr. Dorman performed the EKG test on December 21, 1988. Along with B.R.S.'s deposition testimony, the Board offered into evidence a journal that B.R.S., E.F.S., and their daughter had prepared after E.F.S. was released from the hospital in January 1989, and prior to E.F.S.'s death in February 1989. The journal detailed E.F.S.'s symptoms and activities, as well as his appointments and conversations with Dr. Dorman, from December 13 to December 29, 1988. The journal was admitted into evidence without any objection from Dr. Dorman's counsel.

The Board also presented the depositions of Drs. Lee, Jackson, and Mahmoud. All three testified that the symptoms E.F.S. reported to Dr. Dorman were indicative of a cardiac problem. Drs. Jackson and Lee testified that Dr. Dorman should have promptly referred E.F.S. to a specialist for further testing. In Dr. Lee's opinion, Dr. Dorman's treatment of E.F.S. was below the standard of care, i.e ., below the degree of skill and learning ordinarily used under the same or similar circumstances by members of Dr. Dorman's profession, in several areas. Among other things, Dr. Lee opined that Dr. Dorman did not know how to read EKGs, and had incorrectly read the December 21st x-rays taken at Dr. Bateman's office. Also, according to Dr. Lee, there is no recognized use for intravenous hydrogen peroxide in the treatment of circulatory or respiratory disease, or any other human ailment. Dr. Lee believed that E.F.S. actually had two heart attacks. According to Dr. Lee, E.F.S. suffered his first heart attack prior to December 23rd. In Dr. Lee's opinion, Dr. Dorman's failure to pay attention to the warning signs of the first heart attack, combined with his administering intravenous hydrogen peroxide and Theo Dur, the drug that is contraindicated for heart attack cases, caused E.F.S. to suffer a second heart attack before December 29th.

To rebut the Board's evidence, Dr. Dorman offered his own testimony, and the testimony of his wife, one of his employees, an employee of a health food store adjacent to Dr. Dorman's office, and one of the nurses from Trinity Lutheran's intensive care unit who treated E.F.S. Dr. Dorman also offered the testimony of two members of the church where E.F.S. served as pastor before he died that B.R.S. did not have a good reputation for truthfulness.

After the hearing, the Commission entered its findings of fact and conclusions of law in which it determined that cause existed to discipline Dr. Dorman's license based upon only the two counts related to Dr. Dorman's treatment of E.F.S. Specifically, with regard to Count VI, the Commission found that Dr. Dorman's license was subject to discipline because he (1) failed to diagnose an unstable angina or myocardial infarction on or before December 29, 1988; (2) failed to successfully refer E.F.S. to another doctor and continued to treat E.F.S. despite the fact that Dr. Dorman lacked the competence to do so; (3) injected E.F.S. with intravenous hydrogen peroxide; (4) failed to advise E.F.S. of the seriousness of his condition despite his history and symptoms; (5) caused E.F.S. pain in the period leading to his death because Dr. Dorman failed to

diagnose E.F.S.'s cardiac condition, failed to inform E.F.S.'s family of this condition, and failed to refer E.F.S. to another doctor; (6) prescribed Theo Dur, a drug that is contraindicated in cases of acute myocardial infarction; (7) failed to order a chest x-ray of E.F.S. on December 21, 1988, in light of E.F.S.'s symptoms on that date; (8) held himself out as competent to read an EKG; (9) failed to correctly read the x-rays Dr. Bateman had taken; and (10) was repeatedly negligent in his treatment of E.F.S. On Count VII, the Commission found that Dr. Dorman's license was subject to discipline because he treated E.F.S. with intravenous hydrogen peroxide after signing an agreement with the Board not to do so, and for misrepresenting to E.F.S. that the treatment would be effective.

Following the entry of the Commission's memorandum and order, the Board held a disciplinary hearing in October 1999, and entered its findings of fact, conclusions of law, and disciplinary order. In its order, the Board revoked Dr. Dorman's medical license and ordered that Dr. Dorman would not be able to apply for reinstatement of the license for a period of two years and one day from the effective date of the order, which was October 27, 1999.

Dr. Dorman filed a petition for review of the Commission's memorandum and order and the Board's disciplinary order in the circuit court under § 536.140. After reviewing the entire record, the court determined that the orders of the Commission and the Board were supported by competent and substantial evidence, were not against the weight of the evidence, were not arbitrary, capricious, and unreasonable, and did not involve an abuse of discretion. The court denied Dr. Dorman's petition for review, and entered judgment in favor of the Board, affirming its findings and order. Dr. Dorman filed this appeal.

## Standard of Review

On appeal, this court reviews the final decision of the Commission and the Board, and not the trial court's judgment. *Bodenhausen v. Mo. Bd. of Registration for Healing Arts,* 900 S.W.2d 621, 622 (Mo. banc 1995); *Larocca,* 897 S.W.2d at 39. For purposes of review, the Commission's action and the Board's order "shall be treated as one decision." Section 621.145.[3] The Commission's decision "is presumed valid, and the burden is on the attacking party to overcome that presumption." *Hernandez v. State Bd. of Registration for Healing Arts,* 936 S.W.2d 894, 900 (Mo. App.1997). This court will affirm the decision unless it:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any other reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

Section 536.140.2.

Here, Dr. Dorman claims that the Commission's decision is not supported by competent and substantial evidence and involves an abuse of discretion because it is contrary to the overwhelming weight of the evidence. As this court has previously stated, in reviewing the sufficiency of the

---

**3.** Since Dr. Dorman alleges error in the Commission's findings of fact and conclusions of law, this court will refer to the Commission's portion of the decision.

evidence to support the Commission's decision, this court views the evidence and any inferences therefrom in the light most favorable to the Commission's decision. *Larocca*, 897 S.W.2d at 39. This court should not "substitute its judgment on factual matters for that of the Commission's [sic]." *Hernandez*, 936 S.W.2d at 900. Moreover, because the Commission heard the witnesses' testimony, the determination of the witnesses' credibility belongs to the Commission. *Perez v. Mo. State Bd. of Registration for Healing Arts*, 803 S.W.2d 160, 164 (Mo.App.1991). Thus, this court defers to the Commission's findings as to the credibility of witnesses. *Larocca*, 897 S.W.2d at 45.

## No Error in Relying on Journal and Dr. Lee's Expert Opinion

■ On appeal, Dr. Dorman first contends that the Commission's reliance on the deposition testimony of B.R.S. and the expert testimony of Dr. Lee to support its decision was erroneous because their testimony depended upon facts contained in a journal kept by B .R.S. that detailed the events of December 13 through 29, 1988. Dr. Dorman argues that the journal was inadmissible hearsay evidence and, thus, it could not be used as a factual basis for Dr. Lee's opinion, nor could the Commission rely upon it as substantial evidence to support its decision.

■ It is true that "[s]tatements in violation of evidentiary rules do not qualify as competent and substantial evidence" to

support an agency's decision, "when proper objection is made and preserved." *Concord Publ'g House, Inc. v. Dir. of Revenue*, 916 S.W.2d 186, 195 (Mo. banc 1996). Where no objection is made, however, "hearsay testimony may be considered. . . . In fact, all probative evidence received without objection in a contested case must be considered in administrative hearings." *Id.*[4]

Here, the contents of B.R.S.'s journal and the journal itself were offered into evidence on several occasions. In her deposition, B.R.S. testified extensively from her journal, without any objection from Dr. Dorman. Also, the journal was attached as an exhibit to Dr. Lee's deposition, which was admitted into evidence in the hearing before the Commission without objection. Not only did Dr. Dorman fail to object to the admission of B.R.S.'s journal or its contents on these occasions, but he specifically stated, "No objection[,]" when the Board offered the journal itself as a separate exhibit during the hearing before the Commission. Under these circumstances, Dr. Dorman waived any claim of error he may have had to the admissibility of the journal. *See Ribando v. Sullivan*, 588 S.W.2d 120, 125 (Mo.App.1979).

■ Dr. Dorman has also waived any objection he may have had to the use of the journal as part of the factual basis to support Dr. Lee's expert testimony. "If a question exists as to whether the proffered opinion testimony of an expert is supported by a sufficient factual or scienti-

---

4. This court recognizes that there are cases from this court that appear to hold to the contrary. *See Dickinson v. Lueckenhoff*, 598 S.W.2d 560, 561–62 (Mo.App.1980); *Wilson v. Labor and Indus. Relations Comm'n*, 573 S.W.2d 118, 121 (Mo.App.1978); *Bartholomew v. Bd. of Zoning Adjustment*, 307 S.W.2d 730, 733 (Mo.App.1957) (all stating that hearsay evidence does not qualify as competent and substantial evidence to support an admin-

istrative agency's decision). This court, however, is bound to follow the last controlling decision of the Supreme Court. *Kansas Ass'n of Private Investigators v. Mulvihill*, 35 S.W.3d 425, 432 (Mo.App.2000). Since *Concord* is the last controlling decision of the Supreme Court and it holds that hearsay evidence admitted without objection should be considered in administrative hearings, this court must follow that holding.

fic foundation, the question is one of admissibility. It must be raised by a timely objection or motion to strike." *Washington by Washington v. Barnes Hosp.,* 897 S.W.2d 611, 616 (Mo. banc 1995). Dr. Dorman did not object to Dr. Lee's reliance on the journal as part of the factual foundation for his expert opinion testimony. Because Dr. Dorman waived the issue of the admissibility of the journal itself and the journal as part of the factual foundation for Dr. Lee's testimony, he cannot raise these admissibility arguments now "by arguing the sufficiency of the evidence to support the [Commission]'s findings." *Concord,* 916 S.W.2d at 196. Therefore, the Commission did not err in relying, in part, upon B.R.S.'s journal, B.R.S.'s deposition testimony, and Dr. Lee's expert opinion testimony. This evidence, combined with the other evidence in the record, was sufficient to support the Commission's findings that cause existed to discipline Dr. Dorman's license.

## Commission's Decision Did Not Involve Abuse of Discretion

▪ Dr. Dorman next argues that the Commission's decision involved an abuse of discretion because its findings were against the weight of the evidence. In making this argument, Dr. Dorman contends that his testimony and that of his witnesses essentially refute all of the Commission's findings. He argues that his evidence is more reliable and credible than that presented by the Board, particularly B.R.S.'s journal and her deposition testimony. According to Dr. Dorman, B.R.S.'s journal inaccurately reported E.F.S.'s symptoms and the conversations and events that occurred during E.F.S.'s appointments with Dr. Dorman, and B.R.S.'s journal was inconsistent with her deposition testimony. Dr. Dorman argues that these inaccuracies and inconsistencies, combined with testimony he presented

from two of B.R.S.'s acquaintances that B.R.S.'s reputation for truthfulness was not good, discredited any evidence from B.R.S. Dr. Dorman also argues that there were conflicts in the Board's medical testimony that the Commission should have resolved in his favor.

▪ Dr. Dorman's argument that the Commission's decision is against the overwhelming weight of the evidence is based solely upon an assessment of the credibility of the witnesses. In assessing credibility, the Commission is free to believe all, part, or none of the testimony of any witness. *Harrington v. Smarr,* 844 S.W.2d 16, 19 (Mo.App.1992). Where there is a direct conflict in the testimony, the Commission must make a choice between the conflicting testimony. *Id.* This court must to defer to the Commission's choice, as it is not permitted to substitute its judgment on the credibility of witnesses, *Larocca,* 897 S.W.2d at 45, or on factual matters for that of the Commission. *Hernandez,* 936 S.W.2d at 900. In fact, even if the evidence before the Commission "warrants either of two opposed findings," this court is bound by the Commission's findings. *Larocca,* 897 S.W.2d at 45.

In its order, the Commission specifically recognized some discrepancies between B.R.S.'s journal entries and her deposition testimony, and it recognized Dr. Dorman's evidence regarding B.R.S.'s reputation for truthfulness. Nevertheless, the Commission stated that it did not find B.R.S.'s journal entries and deposition testimony "inaccurate to the point that the entire record would be rendered unreliable," and that it did "not find [B.R.S.] to be a completely unreliable witness." There was evidence in the record to support B.R.S.'s account of Dr. Dorman's treatment of her husband. For example, B.R.S. knew that Dr. Dorman had signed an agreement with the Board not to use intravenous hydrogen

peroxide. B.R.S.'s knowledge of that fact supports her contention that Dr. Dorman told her he was using intravenous hydrogen peroxide to treat E.F.S. Clearly, the Commission chose to believe B.R.S.'s version of her husband's symptoms and the conversations and events that occurred during E.F.S.'s appointments with Dr. Dorman over Dr. Dorman's version. This court must defer to the Commission's decision. *Harrington,* 844 S.W.2d at 19.

With regard to the Board's medical evidence, the Commission found that the Board's expert, Dr. Lee, "provided credible, substantial evidence upon which [it could] base [its] decision." The Commission noted that Dr. Lee's expert testimony was based upon more than just the information contained in B.R.S.'s journal. Dr. Lee's testimony was also based upon information he obtained (1) through his own participation in E.F.S.'s treatment; (2) through conversations with E.F.S. and B.R.S.; (3) from E.F.S.'s medical records at Trinity Lutheran; (4) from Dr. Dorman's deposition testimony; and (5) from Dr. Dorman's records that were made available to Dr. Lee during his deposition.

While Dr. Dorman alleges that there were conflicts in the medical evidence, in its findings, the Commission set out the specific portions of the medical testimony it was relying upon, thus indicating that it resolved any alleged conflicts in the testimony in favor of the Board. The record supports the Commission's decision to do so. For example, Dr. Dorman argues that Dr. Lee "changed his opinion" about Dr. Dorman's failure to correctly read the December 21st EKG after Dr. Lee was shown the actual EKG results. While it is true that after viewing the EKG results, Dr. Lee testified that the EKG did not indicate that a heart attack had occurred, Dr. Lee also testified that the EKG was of very poor quality, because the leads had been mismarked. Additionally, there was

evidence from which the commission could find that the EKG results shown to Dr. Lee were not E.F.S.'s, because an employee of Dr. Dorman's office had thrown away the original EKG results. Contrary to Dr. Dorman's contention, the Commission had an ample basis for resolving any perceived conflicts in the medical evidence in favor of the Board. This court defers to the Commission's decision to do so. *Id.*

Sufficient evidence supports the Commission's findings of cause to discipline Dr. Dorman's license, and those findings are not against the weight of the evidence in light of the Commission's determination regarding the credibility of witnesses and its resolution of any conflicts in the evidence. Therefore, this court finds that the Commission's decision did not involve an abuse of discretion.

The judgment of the circuit court affirming the decisions of the Commission and the Board is affirmed.

All concur.