Hugh L. LACEY, M.D., Appellant,

v.

STATE BOARD OF REGISTRATION FOR THE HEALING ARTS, Respondent.

No. WD 62574.

Missouri Court of Appeals, Western District.

March 16, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2004.

As Modified April 27, 2004.

John L. Roark, Columbia, MO, for appellant.

Nicole L. Sublett, Assistant Attorney General, Jefferson City, MO, for respondent.

Before JOSEPH M. ELLIS, Chief Judge, HAROLD L. LOWENSTEIN, Judge and ROBERT G. ULRICH, Judge.

JOSEPH M. ELLIS, Chief Judge.

Hugh L. Lacey, M.D., ("Dr. Lacey") appeals a judgment of the Circuit Court of Cole County upholding an order of the State Board of Registration for the Healing Arts ("Board") imposing additional discipline on his license to practice medicine in Missouri. After reviewing the record and the law, we reverse, and remand to the circuit court for its entry of a final judgment in favor of Dr. Lacey.

As reflected in the briefs of the parties, the facts of this case, most of which were the subject of joint stipulations presented to the Administrative Hearing Commission ("AHC") or the Board, are essentially undisputed. Dr. Lacey, who has practiced obstetrics and gynecology in the Joplin area for many years, engaged in inappropriate sexual behavior with two of his female patients between June 1999 and February 2000. Following an intervention by Robert Bondurant and the Missouri Physician's Health Program ("MPHP"), in early November 2000, Dr. Lacey reported to the Professional Renewal Center ("PRC") in Lawrence, Kansas, to undergo assessment, with probable treatment and professional rehabilitation to follow.

After receiving appropriate preliminary treatment and rehabilitative therapy from Dr. Richard Irons and other PRC personnel, Dr. Lacey consented to discipline of his medical license. On April 17, 2001, the AHC entered a consent order between Dr. Lacey and the Board that incorporated, among other things, a joint stipulation of facts and an agreed disciplinary order (the "First Disciplinary Order" or "FDO"). The FDO provides for the suspension of Dr. Lacey's medical license for ninety days, followed by a seven-year probationary period during which Dr. Lacey agreed to continue to submit to care, counseling, and treatment by Dr. Irons. Dr. Lacey further agreed to participate in the MPHP treatment program throughout the duration of the disciplinary period.

The FDO also contains a number of specific provisions governing Dr. Lacey's medical practice during the seven-year probationary period. Paragraph II.A.2 of the FDO requires Dr. Lacey to comply with "all recommendations for treatment made by Dr. Irons." Those recommendations, which were made in a January 9, 2001 letter from Dr. Irons to Robert Bondurant of MPHP, include the following:

Dr. Lacey will limit his practice of medicine and surgery to office and hospital settings and not see patients outside of those venues. He will use a female chaperone for physical examinations of all female patients. The chaperone will be a licensed health care professional. He will continue to examine women only with a chaperone present.

Paragraph II.A.3 of the FDO also requires Dr. Lacey to "follow all recommendations for treatment or aftercare made by" MPHP, as well as to "comply with each and every requirement to remain in the [MPHP] program." According to the MPHP "Advocacy Agreement" signed by both Mr. Bondurant and Dr. Lacey on December 6, 2000, Dr. Lacey was subject to the following such requirement, which was handwritten in a section headed "Other requirements":

A nurse/chaperone will be present for all gyn[ecological] patient examinations.

Meanwhile, paragraph II.A.4 of the FDO provides:

During the disciplinary period, Licensee [Dr. Lacey] shall have a female licensed health care professional present during all female patient visits.

Shortly before signing and agreeing to be bound by the terms of the FDO on April 10, 2001, Dr. Lacey sought guidance from his attorney as to whether a nurse chaperone was required only while he was performing physical, obstetrical, or gynecological examinations involving actual physical contact with his female patients, or also during the interview/medical history portion of female patient visits. After checking with James Ertle, who was then serving as counsel for the Board (and, the record shows, actually signed the FDO in that capacity), Dr. Lacey's attorney advised Dr. Lacey that Mr. Ertle thought it would be appropriate for Dr. Lacey to take the medical history from his female patients with the door to the examining room open and to conduct all physical examinations in the presence of the nurse chaperone. Thereafter, Dr. Lacey began employing this procedure—that is, he utilized a nurse chaperone during the physical examination portion of each female patient's office visit, but not during the medical history-taking portion, which takes approximately ten to fifteen minutes to complete. All medical histories were taken by Dr. Lacey in the examining room, with the door deliberately left open so members of Dr. Lacey's office staff could see into the room. All patients were fully clothed during the medical history-taking portion of their office visits.

About a month later (in May 2001), Dr. Lacey met with one of the Board's investigators, Michael Bergman, about the terms and conditions of his probation. During this meeting, Dr. Lacey and Mr. Bergman discussed the "Chaperone Requirement" of the FDO, and Dr. Lacey took written notes of their discussion. According to Dr. Lacey's notes, Mr. Bergman advised him, "This means that you must have a chaperone present for all examinations." On or about September 26, 2001,[1] Dr. Lacey was advised that the Board had interpreted the FDO to require the presence of a nurse chaperone *at all times* during female patient visits. After Dr. Lacey learned of this interpretation, he immediately made arrangements for a nurse chaperone to be present during the entirety of all female patient visits.

On February 25, 2002, the Board filed a complaint and notice of hearing against Dr. Lacey for violating the terms of his probation. In particular, the Board alleged that Dr. Lacey's failure, from May 29, 2001, through September 26, 2001, "to perform all aspects of a female patient visit before a licensed health care professional [*e.g.*, nurse chaperone] is in violation of Paragraph 4 of the [First] Disciplinary Order." On April 5, 2002, the Board conducted an evidentiary hearing to determine whether Dr. Lacey had "violated any disciplinary terms previously imposed or agreed to pursuant to settlement." § *620.153*.[2] In addition to the facts recited above, the Board's Chief Investigator, John Heidy, testified that he was unaware of any notification from MPHP administrators that Dr. Lacey had failed to comply with any of the terms of the FDO. Dr. Lacey also testified that he was unaware of any patient complaints regarding inappropriate behavior on his part, either be-

---

1. This is apparently the date on which two female nurses assigned to serve as chaperones for Dr. Lacey reported to the Board or its representatives that they were instructed by Dr. Lacey and members of his office staff to perform their duties only while he was physically examining female patients.

2. Unless stated otherwise, all statutory citations are to RSMo 2000.

fore or after September 26, 2001, when he began employing the revised office procedure described above as to his female patients.

On April 23, 2002, the Board issued another order (the "Second Disciplinary Order" or "SDO") imposing additional license discipline, under which the length of the term of Dr. Lacey's probation was extended by an additional nine months and twenty days. As provided in §§ 536.100 to 536.140, Dr. Lacey timely filed a petition for judicial review of the Board's decision in the Circuit Court of Cole County, requesting reversal of the SDO and an award of attorney's fees and costs. After reviewing the record, the briefs submitted by both parties, and hearing oral argument, the circuit court entered a final judgment affirming the Board's SDO of April 23, 2002. Dr. Lacey now appeals to this court, as authorized under § 536.140.6.

### *Extent and Standard of Review*

 Where license discipline is imposed, the Board ordinarily assesses the appropriate level of discipline after the AHC has made an independent determination, on the law and the evidence submitted by both the Board and the licensee, that cause for discipline exists. On appeal from the judgment of the circuit court in such cases, we treat the AHC's decision as to the existence of cause and the Board's subsequent disciplinary order " 'as one decision,' " and proceed to review that combined decision, not the circuit court's judgment. *Dorman v. State Bd. of Registration for the Healing Arts,* 62 S.W.3d 446, 453 (Mo.App. W.D.2001) (quoting *§ 621.145,* which governs judicial review of "all final decisions" of the AHC).

However, this case involves the Board's imposition of additional discipline, after hearing, under the provisions of § 620.153. That statute, which was enacted in 1998, provides, in its entirety:

> Any board, commission or committee within the division of professional registration [3] may impose additional discipline when it finds after hearing that a licensee, registrant or permittee has violated any disciplinary terms previously imposed or agreed to pursuant to settlement. The board, commission or committee may impose as additional discipline, any discipline it would be authorized to impose in an initial disciplinary hearing.

*Id.*

Under the circumstances presented in § 620.153 cases, the prior, underlying final decision of the AHC originally finding cause for discipline is generally either not at issue or for one reason or another is no longer appealable, so the Board's order imposing additional discipline is the only action which can be the subject of appellate review. Although the parties do not cite, and we have been unable to find, any cases discussing the standard of review on appeal of a decision of the Board imposing additional license discipline under § 620.153, we think it should be the same one used in ordinary initial license discipline cases, with the additional understanding that only the Board's decision is reviewed, rather than those of both the AHC and the Board considered together "as one." *See § 536.100* (authorizing judicial review of "a final decision in a contested case ... as provided in sections 536.100 to 536.140, unless some other provision for judicial review is provided by statute").[4]

---

3. The State Board of Registration for the Healing Arts is a board within the Division of Professional Registration. *See § 620.010.15(1).*

4. In so holding, we are mindful that in cases involving § 620.153, the Board is essentially playing the roles of accuser, prosecutor, and administrative trier all at the same time, with-

Under our standard of review, then, we review the final decision of the Board, not the judgment of the circuit court. *See Dorman,* 62 S.W.3d at 453. The Board's decision is presumed valid, and the burden is on the party attacking it to overcome that presumption. *Id.* We will affirm the Board's decision unless it: (1) was in violation of constitutional provisions; (2) was in excess of its statutory authority or jurisdiction; (3) was unsupported by competent and substantial evidence upon the whole record; (4) was, for any reason, unauthorized by law; (5) was made upon unlawful procedure or without a fair trial; (6) was arbitrary, capricious or unreasonable; or (7) involved an abuse of discretion. *Id.; § 536.140.2.* While we defer to the Board's findings of fact, where its decision is based upon an interpretation, application, or conclusion of law, it is subject to our independent judgment. *Cmty. Bancshares, Inc. v. Sec'y of State,* 43 S.W.3d 821, 823 (Mo. banc 2001); *Kansas City v. Mo. Comm'n on Human Rights,* 632 S.W.2d 488, 490 (Mo. banc 1982). "In other words, the decision of the administrative body on a question of law does not preclude, restrict or control review of the issue by the Court." *Kansas City,* 632 S.W.2d at 490.

### *Analysis*

In his first point, Dr. Lacey argues that the Board erred in entering the SDO because it was unlawful, capricious, unreasonable, constituted an abuse of discretion, and was not supported by competent and substantial evidence, in that the Board improperly applied Missouri law to the facts in determining that the FDO unambiguously required a female nurse chaperone be present throughout the entirety of all office visits by his female patients. We agree.

out the usual benefit, to medical licensees, of subsequent neutral and independent review by the AHC. Our Supreme Court has nevertheless held that "such a combination of roles, by itself, does not deny due process, so long as the administrative hearing is subject to judicial review." *Mendelsohn v. State Bd. of Registration for the Healing Arts,* 3 S.W.3d 783, 786 (Mo. banc 1999) (citing *Rose v. State Bd. of Registration for the Healing Arts,* 397 S.W.2d 570, 574 (Mo.1965)). That being so, it is not for this court to second-guess the General Assembly's decision to carve out an exception to the usual rule in license discipline cases by allowing the Board to function as investigator, accuser, prosecutor, and administrative trier of fact in cases involving alleged violations of "any disciplinary terms previously imposed or agreed to pursuant to settlement" as provided in § 620.153.

We are also mindful that, pursuant to § 334.100.2, the Board "may cause a complaint to be filed with the administrative hearing commission ... against any holder of any certificate of registration or authority, permit or license required by this chapter ... for any one or any combination of" the causes for discipline listed in §§ 334.100.2(1)-(25). One of those causes is "[m]isconduct, fraud, misrepresentation, dishonesty, unethical conduct or unprofessional conduct in the performance of the functions or duties of any profession licensed or regulated by this chapter, including, but not limited to" the prohibited acts listed in §§ 334.100.2(4)(a)-(q). *§ 334.100.2(4).* Among the conduct prohibited by those subsections is "[v]iolating a probation agreement with this board or any other licensing agency[.]" *§ 334.100.2(4)(o).* As is obvious from the procedural history of this case, the Board did not employ this procedure here. That is to say, although the Board evidently *could* have filed a complaint with the AHC seeking its determination, pursuant to § 334.100.4 and Chapter 621, that Dr. Lacey's license to practice medicine was subject to further disciplinary action for engaging in conduct prohibited by § 334.100.2(4)(*o*), in the instant case, the Board did not. Instead, the Board opted to impose additional discipline against Dr. Lacey under the terms of § 620.153, by holding a contested hearing after which it concluded that he had "violated ... disciplinary terms previously imposed or agreed to pursuant to settlement." *§ 620.153.*

The overarching legal issue presented by this point relied on is quite simple: Did Dr. Lacey, in utilizing, prior to September 26, 2001, a female nurse chaperone during the physical examination portion of each of his female patients' office visits, but not during the medical history-taking portion of those visits, violate the terms of the FDO? If he did, the Board's SDO was authorized by law and must be affirmed. If he did not, it was not and must be reversed.

 At the outset, we note that the FDO is nothing more than a settlement agreement between the Board and Dr. Lacey which was drafted by the Board, signed by both parties, and approved by the AHC. "Missouri courts generally treat settlement agreements as contracts and we find no reason to view this settlement agreement any differently." *State ex rel. Mo. Cable Telecomms. Ass'n v. Mo. Pub. Serv. Comm'n*, 929 S.W.2d 768, 774 (Mo. App. W.D.1996). The issue before us is, therefore, whether the Board properly interpreted the terms of that contract, which we are to determine using "the same principles applicable to [the interpretation of] any other contractual agreement." *Andes v. Albano*, 853 S.W.2d 936, 941 (Mo. banc 1993); *see also Liquidation of Prof'l Med. Ins. Co. v. Lakin*, 88 S.W.3d 471, 476 (Mo.App. W.D.2002). Contract interpretation is, of course, a question of law, *Sonoma Mgmt. Co. v. Boessen*, 70 S.W.3d 475, 479 (Mo.App. W.D.2002), on which our decision is entirely independent from that of the Board. "The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995). "In determining the intent of the parties to a contract, we review the terms of a contract as a whole, not in isolation."

*Tuttle v. Muenks*, 21 S.W.3d 6, 11 (Mo. App. W.D.2000).

The contents of the Board's SDO confirm Dr. Lacey's claim that, in reaching its decision, the Board did not consider or interpret the whole FDO. The SDO was based *entirely* on two facts, both of which were stipulated to by the parties prior to the evidentiary hearing of April 5, 2002. First, the Board found that paragraph II. A.4 of the FDO required Dr. Lacey "to have a female licensed health professional present during all female patient visits." Second, the Board found that prior to September 26, 2001, Dr. Lacey "failed to have a female licensed health professional present during the entirety of all female patient visits." From this, the Board drew the legal conclusions that Dr. Lacey "violated the Settlement Agreement" by engaging in conduct which was "in violation of the terms of discipline set forth in the Settlement Agreement." Based on those conclusions, the Board decided to extend the length of the term of Dr. Lacey's probation by an additional nine months and twenty days.

 Thus, the Board's decision against Dr. Lacey was based on its reading of only a portion of the FDO—paragraph II.A.4, which, the Board contends, is perfectly clear and unambiguous. However, "[a]mbiguity depends on context. Contract language is not interpreted in a vacuum, but by reference to the contract as a whole." *Purcell Tire & Rubber Co. v. Executive Beechcraft, Inc.*, 59 S.W.3d 505, 510 (Mo. banc 2001) (internal citation omitted). "In determining whether or not there is such an ambiguity as calls for construction, the whole instrument must be considered." *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973). This the Board did not do. The SDO demonstrates that the Board interpreted the language of paragraph II.A.4 in

a vacuum and failed to consider the FDO as a whole by focusing exclusively on that paragraph, while ignoring the language of paragraphs II.A.2 and II.A.3 and the matters they incorporated by reference. The Board insists that this was proper, pointing out that "[n]owhere in the express language of Paragraphs 2 and 3 is a chaperone requirement mentioned." However, this argument overlooks the law of Missouri on this point, which is that "matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract *in haec verba.*" *Dunn Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 435 n. 5 (Mo. banc 2003); *Wasson v. Schubert,* 964 S.W.2d 520, 524 (Mo.App. W.D.1998). As recounted *supra,* paragraph II.A.4 of the FDO provides:

> During the disciplinary period, Licensee [Dr. Lacey] shall have a female licensed health care professional present during all female patient visits.

However, paragraph II.A.2 of the FDO also requires Dr. Lacey to comply with "all recommendations for treatment made by Dr. Irons," which includes, by reference, the following:

> Dr. Lacey will limit his practice of medicine and surgery to office and hospital settings and not see patients outside of those venues. He will use a female chaperone for physical examinations of all female patients. The chaperone will be a licensed health care professional. He will continue to examine women only with a chaperone present.

Moreover, paragraph II.A.3 of the FDO further requires Dr. Lacey to "follow all recommendations for treatment or aftercare made by" MPHP, as well as to "comply with each and every requirement to remain in the [MPHP] program." One such requirement, which was also incorporated into the FDO by reference, is:

> A nurse/chaperone will be present for all gyn[ecological] patient examinations.

As noted by Dr. Lacey, the Board did not even consider the question of whether, by virtue of the writings incorporated into the FDO by reference in paragraphs II.A.2 and II.A.3, paragraph II.A.4 was ambiguous. That, too, was error, because "[w]ritings made a part of the contract by annexation or reference are to be considered in determining whether or not it is ambiguous." *Hathman,* 491 S.W.2d at 264.

A contract is not made ambiguous by the mere fact that the parties to it disagree on its proper construction. *Id.* "An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Rodriguez v. Gen. Accident Ins. Co. of Am.,* 808 S.W.2d 379, 382 (Mo. banc 1991). "The test for ambiguity is whether the disputed language is reasonably susceptible of more than one meaning when the words are given their plain meaning as understood by an average person." *Daniels Express & Transfer Co. v. GMI Corp.,* 897 S.W.2d 90, 92 (Mo.App. E.D.1995). "To determine whether the terms of a contract are ambiguous, words should be given their natural and ordinary meaning." *Atlas Reserve Temps. v. Vanliner Ins. Co.,* 51 S.W.3d 83, 87 (Mo.App. W.D.2001).

In the instant case, we must, therefore, determine whether the phrase "present during all female patient visits" in paragraph II.A.4 has a duplicitous, indistinct, or uncertain meaning and is, therefore, reasonably susceptible to more than one meaning, considering both the natural and ordinary meaning of the words used and the incorporated language of paragraphs II.A.2 and II.A.3 involving the same subject matter. The Board argues that as it appears in paragraph II.A.4, the phrase "present during all female patient visits" means "present *throughout the entirety of*

all female patient visits." On the other hand, Dr. Lacey contends that in light of (1) the natural and ordinary meaning of the word "during"; (2) the provisions of paragraphs II.A.2 and II.A.3; and (3) the construction given paragraph II.A.4 by Board representatives shortly before and after execution of the FDO, the phrase "present during all female patient visits" could also reasonably be understood to mean "present *for the physical examination portion of* all female patient visits."

■ We agree with Dr. Lacey. To begin with, virtually every dictionary we consulted contains two definitions of the preposition "during"—one which supports the Board's interpretation, and one which supports Dr. Lacey's. *See, e.g., Webster's Third New International Dictionary* 703 (1993) (defining "during" as "throughout the continuance or course of" and "[a]t some point in the course of"); *The American Heritage College Dictionary* 427 (3d ed.1993) ("[t]hroughout the course or duration of" and "[a]t some time in"); *Webster's New World Dictionary* (3d ed.1991) ("[t]hroughout the duration of" and "[a]t some point in the entire time of"). We further observe that appellate courts construing criminal and civil statutes containing the word "during" have expressly held that it normally has the meaning contended by Dr. Lacey, rather than that urged by the Board.[5]

The Board attempts to meet this argument by contending that our interpretive focus should be on the meaning of the term "visit," rather than "during."[6] The Board argues that since a "visit" to a

doctor's office clearly includes all aspects of a patient's call, including but not limited to the taking of a medical history and the giving of a physical examination, paragraph II.A.4 unambiguously requires that a nurse chaperone be present "whenever Lacey was with a female patient in his professional capacity," no matter how "during" is defined. We disagree. Whether the focus is on the meaning of the word "during" (as suggested by the Board in the evidentiary hearing) or the word "visit" (as now belatedly suggested by the Board in its brief), the ultimate issue remains whether or not the FDO unambiguously requires the presence of a nurse chaperone when Dr. Lacey is merely interviewing female patients in an "open door" fashion rather than actually physically examining them.

Moreover, Dr. Lacey's position is bolstered by the additional contract language incorporated by reference in paragraphs II.A.2 and II.A.3, which only requires the presence of a nurse chaperone when Dr. Lacey is conducting medical "examinations" involving actual physical contact with his female patients. Dr. Lacey argues, and we agree, that this language could reasonably be found to complement and clarify that found in paragraph II.A.4 by specifying precisely at which point in the course of female patient "visits" the presence of a nurse chaperone is required. *See Gen. Am. Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 133 (Mo.App. W.D.1993). When the language of the FDO is interpreted by considering the contract as a whole and proper consideration is given to

---

5. *See, e.g., State v. Caprio,* 477 A.2d 67, 72 (R.I.1984); *Steele v. Ft. Sanders Anesthesia Group, P.C.,* 897 S.W.2d 270, 279–80 (Tenn. Ct.App.1994).

6. While not dispositive, it is worth noting that this is not the legal position originally taken by counsel for the Board. In her opening statement at the evidentiary hearing, counsel for the Board urged the imposition of additional license discipline since the evidence would show that Dr. Lacey "failed to have a female professional present *during all times of* [his female] patient visits."

the more specific (and more limited) descriptions of Dr. Lacey's obligations concerning the way he is to conduct office "visits" involving his female patients, *id.*, it becomes clear to this court that Dr. Lacey's interpretation of the meaning of paragraph II.A.4 is reasonable. In other words, in light of the contract as a whole, it is readily apparent to this court that reasonable people could fairly and honestly differ in their construction of the term "during" as used in the phrase "present during all female patient visits." Accordingly, we hold that paragraph II.A.4 of the FDO is ambiguous.

 "[I]f a written contract appears on its face to be incomplete or ambiguous, extrinsic evidence, either written or oral, is admissible to resolve such ambiguity in order to determine the true intention of the parties." *Fisher v. Miceli*, 291 S.W.2d 845, 848 (Mo.1956). In particular, this includes evidence concerning the practical construction which the parties themselves place upon a contract. *Modine Mfg. Co. v. Carlock*, 510 S.W.2d 462, 468 (Mo.1974). " 'It is well established that the interpretation placed on the contract by the parties prior to the time it became a matter of controversy is entitled to great, if not controlling, influence in ascertaining the intent and understanding of the parties and the courts will generally follow such practical interpretation.' " *Rhoden Inv. Co. v. Sears, Roebuck & Co.*, 499 S.W.2d 375, 383 (Mo.1973) (quoting *South Side Realty Co. v. Hamblin*, 387 S.W.2d 224, 229 (Mo.App. W.D.1964)).

In the instant case, the acts and deeds of the parties before paragraph II.A.4 became a bone of contention shed what we consider to be a great deal of light on their mutual intent and understanding of the "Chaperone Requirement." As noted *su-*

*pra*, shortly before executing the FDO on April 10, 2001, Dr. Lacey sought guidance from his attorney as to whether a nurse chaperone was required only while he was performing physical, obstetrical, or gynecological examinations involving actual physical contact with his female patients, or whether a nurse chaperone was also needed during the interview/medical history portion of female patient visits. He was told by his attorney that according to Mr. Ertle, it would be acceptable for Dr. Lacey to take the medical history from his female patients with the door to the examining room open and to conduct all physical examinations in the presence of the nurse chaperone. Dr. Lacey then immediately began employing this procedure, which he believed correctly expressed the intent of both parties to the FDO. About a month later, Mr. Bergman advised Dr. Lacey that the "Chaperone Requirement" of the FDO meant that he "must have a chaperone present for all examinations." It was not until some four months later, on or about September 26, 2001, that Dr. Lacey was told the Board had apparently changed its interpretation so as to require the presence of a nurse chaperone *at all times*. We, therefore, conclude that the practical construction of the contract as indicated by the parties' acts and deeds favors Dr. Lacey's interpretation and constitutes considerable, if not controlling, competent and substantial evidence of their mutual intent and understanding as to the meaning of the FDO.

The Board's only response to this argument is that it was up to the Board to determine the probative force of such extrinsic evidence of intent. "[I]t is apparent," claims the Board, that "the Board weighed the hearsay evidence presented by Lacey and determined it unpersuasive."[7] The Board is mistaken. First of

7. The record shows that the Board's attorney
made no contemporaneous objection to the

all, what is apparent from the Board's findings and conclusions in this case is that it focused solely (and, as we have held, erroneously) on the language of paragraph II.A.4, while ignoring not only the prior writings incorporated by paragraphs II.A.2 and II.A.3, but also the uncontroverted extrinsic evidence of intent presented by Dr. Lacey. As argued by Dr. Lacey in his brief, had the Board correctly interpreted and applied the law, it would have made appropriate findings as to the meaning and effect of those writings and that extrinsic evidence of intent—but it did not. Second, as the Board itself drafted the contract and presented no contrary extrinsic evidence of intent, even if Dr. Lacey had presented no such evidence (or if he had offered it but the Board had exercised its prerogative to disbelieve it as not credible), we would still find in his favor under

the well-established default rule of Missouri contract interpretation that " 'if a contract is fairly open to two interpretations that construction must be adopted which is against him who prepared it and favor him who merely signed it.' " *John Deere Co. v. Hensley*, 527 S.W.2d 363, 365 (Mo. banc 1975) (quoting *Engel v. Cord Moving & Storage Co.*, 313 S.W.2d 173, 176 (Mo.App. E.D.1958)).[8] Point granted.

In his second point, Dr. Lacey contends that that the Board erred in entering the Second Disciplinary Order because it was unlawful, unconstitutional, and in excess of its statutory authority and jurisdiction, in that the Board lacks the power, under § 620.153 and *State Board of Registration for the Healing Arts v. Robertson*, No. HA–85–0278 (Mo. Admin. Hearing Comm'n Mar. 29, 1988),[9] to impose addi-

introduction of this evidence on hearsay or any other grounds. In its brief, the Board candidly admits that since it did not object or move to strike, it waived any hearsay complaint and the evidence had to be considered by the Board under the Missouri Supreme Court's holding in *Concord Publishing House, Inc. v. Director of Revenue*, 916 S.W.2d 186 (Mo. banc 1996). The Board is right.

> [H]earsay testimony may be considered if no objection is made. In fact, all probative evidence received without objection in a contested case must be considered in administrative hearings. § 536.070(8). The Director did not object or move to strike a majority of [the witness'] testimony. Having waived the admissibility issue as to this evidence, appellant may not raise it now [on appeal].

916 S.W.2d at 195–96 (internal citation omitted). In making this observation, we do not decide whether the evidence in question was, in fact, hearsay not falling within any exception, as insinuated by the Board. We merely note that even assuming it was, under the circumstances here, it was properly admitted and had to be considered by the Board for what it was worth.

8. This canon of construction is employed as "a last resort" when a contract is ambiguous but there is no evidence showing the parties'

intent. *Graham v. Goodman*, 850 S.W.2d 351, 356 (Mo. banc 1993); *see also Mo. Consol. Health Care Plan v. BlueCross BlueShield*, 985 S.W.2d 903, 910 (Mo.App. W.D.1999) (noting that this canon "is applicable only if and when an ambiguity is found and the parties' intent cannot be determined otherwise from parol evidence").

9. In their briefs, both parties implicitly assume that the AHC's decision in *Robertson* constitutes binding precedent in this court. But since the AHC is not a court of law, its decisions have no weight as binding legal precedent in this or any other Missouri appellate court. *Cent. Hardware Co. v. Dir. of Revenue*, 887 S.W.2d 593, 596 (Mo. banc 1994). On the other hand, the rulings, interpretations, and decisions of a neutral, independent administrative agency like the AHC, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v.*

tional discipline for an alleged license probation violation where the conduct constituting the violation is not deliberate or willful but merely inadvertent or unintentional in nature and would not, standing alone, constitute independent legal cause for initial discipline before the AHC under § 334.100.2. While this point presents a challenging legal issue regarding the extent and effect of the potential interplay between § 620.153 and § 334.100.2, in light of our disposition in favor of Dr. Lacey on his first point relied on, there is no need to address this issue, which we leave for a future court to decide.

### Conclusion

For the reasons discussed *supra,* we hold that the Board erred in entering the Second Disciplinary Order of April 23, 2002 imposing additional discipline on Dr. Lacey's license to practice medicine because it was unauthorized by law under § 536.140.2(4). The circuit court's judgment upholding the Second Disciplinary Order is, therefore, reversed, and the cause is remanded to the circuit court for its entry of a judgment in favor of Dr. Lacey on the Board's February 25, 2002 complaint against him for violating the terms of his probation.

One matter remains: in his opening brief, Dr. Lacey requested that this court "find that the Board's position was not substantially justified, that Dr. Lacey is entitled to an award of his reasonable attorneys' fees and expenses, and enter an appropriate Order permitting Dr. Lacey to establish such attorneys' fees and expenses in this proceeding or on remand to the Circuit Court of Cole County." However, an application for an award of attorney's fees and expenses pursuant to § 536.087 must be "filed in the court, agency, or commission that rendered the final disposi-

*Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161,

tion or judgment for the prevailing party." *Greenbriar Hills Country Club v. Dir. of Revenue,* 47 S.W.3d 346, 350 (Mo. banc 2001). Accordingly, should Dr. Lacey wish to litigate the issue of his entitlement to such an award, he should timely file an application containing all the required elements in the circuit court after the cause has been remanded and the circuit court's judgment in his favor becomes final.

All concur.