

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| CITY OF KANSAS CITY, MISSOURI, | ) ) ) | |
| Appellant, | ) ) | |
| v. | ) ) | WD85602 |
| OCCUPATIONAL HEALTH CENTERS OF THE SOUTHWEST, P.C., d/b/a CONCENTRA MEDICAL CENTERS, | ) ) ) ) ) ) ) | Filed: September 12, 2023 |
| Respondent. | ) | |

**Appeal from the Circuit Court of Jackson County
The Honorable S. Margene Burnett, Judge**

**Before Division Three: Alok Ahuja, P.J., and
Karen King Mitchell and Edward R. Ardini, Jr., JJ.**

The City of Kansas City asserted a claim for contractual indemnity against Occupational Health Centers of the Southwest, P.C. (doing business as Concentra Medical Centers) in the Circuit Court of Jackson County. The City's indemnity claim sought to shift to Concentra the costs associated with an employment discrimination claim which had been asserted against the City. The circuit court granted summary judgment to Concentra, and the City appeals. We affirm.

## Factual Background

In 2012, the City and Concentra executed Contract No. EV1227, for the performance of drug and alcohol testing on City employees. The Contract was renewed annually through January 31, 2017.

On May 5, 2014, the City sent Shahidah Hazziez, a City employee, to a Concentra facility for a purportedly random drug screening. Hazziez later contended that she and other Muslim City employees had been disproportionately selected for such drug testing.

Hazziez was unable to provide a urine sample of sufficient volume through two attempts, which she claimed was due to a bladder infection. Hazziez was told that she would have to stay at the testing site until she provided a sufficient sample, or for at least three hours following her first attempt. Because Hazziez had observed blood in her urine and believed she required medical attention, she left the testing facility to go see her physician before three hours had elapsed. Hazziez submitted to a urine test at her doctor's office later that day, which was drug-free.

Concentra notified the City that Hazziez had refused to provide a compliant urine sample, and had claimed that it was due to a bladder infection. The City requested further information from Concentra and from eScreen, Inc., which developed the testing protocol and testing selection process for the City. After reviewing the information supplied by Concentra and eScreen, the City terminated Hazziez's employment for violation of its Drug and Alcohol Misuse Testing Policy.

Hazziez sued the City, as well as a number of Concentra-affiliated entities and employees. Hazziez also sued eScreen, Inc., as well as eScreen's parent

company Alere, Inc.  In her Second Amended Petition, Hazziez alleged claims under the Missouri Human Rights Act, ch. 213, RSMo, for retaliation and for employment discrimination based on her sex, religion, race, and based on her perceived and actual status as disabled.  Hazziez also alleged claims for negligence and strict products liability against the eScreen defendants for their development of the City's testing methods and procedures, and the system for processing test results.

Hazziez settled her claims against the Concentra defendants on May 6, 2016.

A jury trial began against the City and the eScreen defendants on October 2, 2017.  The eScreen defendants settled while trial was underway.  After an eight-day trial, Hazziez submitted four claims to the jury.  Those claims alleged that the City had discriminated against her because it regarded her as disabled; because she was in fact disabled; because of her sex; and because of her religion.  In the verdict directors for each claim, the only adverse employment action Hazziez identified was the termination of her employment with the City.  The jury found in Hazziez's favor and against the City on Hazziez's claims for discrimination based on sex and a perceived disability.  The jury awarded her compensatory damages of $172,000.00, but found that the City was not liable for punitive damages.  The court subsequently awarded Hazziez attorney's fees in the amount of $303,660.00, and costs of $10,130.85.

This court affirmed the judgment on appeal; we also awarded Hazziez her attorney's fees on appeal.  *Hazziez v. City of Kansas City*, Nos. WD82336, WD82363, WD83200 & WD83227, 606 S.W.3d 149 (Mo. App. W.D. April 7,

3

2020) (*mem*.). We remanded to the circuit court for determination of the additional fee award; the circuit court later determined that Hazziez's reasonable appeal-related fees and expenses were $88,896.00. The City satisfied the judgment in November 2020.

Prior to the trial of Hazziez's underlying discrimination claims, the City filed a third-party petition against Concentra for indemnification under Concentra's contract for drug and alcohol testing services. We quote extensively from the relevant contractual provisions in the legal discussion which follows.

The City and Concentra filed cross-motions for summary judgment on the City's third-party claim. The circuit court entered its judgment on July 29, 2022, granting Concentra's motion for summary judgment and denying the City's cross-motion. In its judgment, the circuit court concluded that, despite a broader indemnification clause contained in the City's form contract, the parties had agreed to modifications to the indemnity language which Concentra had proposed in its response to the City's Request for Proposals. The circuit court also found that the scope of Concentra's indemnity obligations was reflected in the language of the insurance certificate and policy language which Concentra had submitted to the City as part of its contract proposal.

Ultimately, the circuit court concluded that Hazziez's claims against the City were not based in whole or in part on Concentra's actions, but that the City's liability to Hazziez was based on its own actions, for which Concentra had no indemnification obligation:

> Concentra was not a party to the jury trial, and the jury instructions contained no mention of Concentra. The verdict was against the City exclusively and resulted solely from the City's statutory violations of the Missouri Human Rights Act. This Court finds that Concentra is

not liable for the City's statutory violations of the Missouri Human Rights Act and the harm caused to Plaintiff as a result.

The City appeals.

## Standard of Review

We review the grant of a motion for summary judgment *de novo*. *Day Advertising, Inc. v. Hasty*, 606 S.W.3d 122, 129 (Mo. App. W.D. 2020).

> The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. This Court reviews the record in the light most favorable to the party against whom judgment was entered. Summary judgment is appropriate when the moving party has [established], on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law. We may affirm if the record shows that summary judgment was appropriate either on the basis it was granted by the trial court or on an entirely different basis, if supported by the record.

*Randolph v. City of Kansas City*, 620 S.W.3d 636, 639 (Mo. App. W.D. 2021) (quoting in part *Newton v. Mercy Clinic E. Cmtys.*, 596 S.W.3d 625, 628 (Mo. 2020); other citation omitted).

## Discussion

On appeal, the City asserts eight Points Relied On. Despite the number of separate Points raised by the City, this appeal boils down to two fundamental issues: (1) determining the operative contract language which defines Concentra's indemnity obligations; and (2) determining the basis for Hazziez's discrimination claims against the City, for which the City seeks indemnity. We address those issues in turn.

Generally, "rules applicable to the construction of contracts apply generally to indemnity agreements." *Chehval v. St. John's Mercy Medical Ctr.*, 958 S.W.2d 36, 38 (Mo. App. E.D. 1997). "The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 838 (Mo. App. W.D. 2004) (quoting *Butler v. Mitchell-Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. 1995)). In doing so, we review the contract holistically rather than looking at provisions in isolation. *Lacey*, 131 S.W.3d at 838. We construe individual terms of a contract to avoid rendering other terms meaningless; "[a] construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Kohner Properties, Inc. v. SPCP Group VI, LLC*, 408 S.W.3d 336, 342-343 (Mo. App. E.D. 2013). "Where the contract consists of multiple documents, as is the case here, all of the documents must be read together in an effort to capture what was intended." *Lin v. Clark,* 666 S.W.3d 270, 278 (Mo. App. W.D. 2023) (quoting *Metrc, LLC v. Steelman*, 617 S.W.3d 472, 481 (Mo. App. W.D. 2021)).

We focus on the plain and ordinary meaning of the contract itself, and do not look to extrinsic evidence unless the terms of the contract are ambiguous. *Lacey*, 131 S.W.3d at 839. "A contract is not made ambiguous by the mere fact that the parties to it disagree on its proper construction"; rather, it is ambiguous if the words used are reasonably susceptible to more than one plain meaning. *Id.*

"Where parties stand on substantially equal footing, one may legally agree to indemnify the other against the results of the indemnitee's own negligence." *Economy Forms Corp. v. J.S. Alberici Const. Co., Inc.*, 53 S.W.3d 552, 554 (Mo.

App. E.D. 2000). However, such a provision "must be stated clearly, unequivocally, and conspicuously." *Utility Serv. and Maint., Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910, 913 (Mo. 2005). Nonetheless, when the two parties are sophisticated entities negotiating at arm's length, a broad, all-inclusive indemnification provision may be sufficient to indemnify against the indemnitee's own negligence, even though it does not explicitly refer to the indemnitee's negligent acts. *Id.* at 914.

Contract No. EV1227, for Concentra's performance of drug and alcohol testing services, was comprised of multiple documents. As stated in the first section of the "Standard City Contract" which the parties executed:

> The Contract between the CITY and CONTRACTOR consists of the following Contract Documents: (a) this Contract; (b) CONTRACTOR's Proposal dated August 17, 2011 that is attached hereto and incorporated into this Contract; (c) CITY's RFP No. EV1227 that is incorporated into this Contract by reference; (d) any and all Attachments and Exhibits attached to the Contract. All documents listed in this Section 1 shall be collectively referred to as the "Contract Documents" and are incorporated into this Contract. CITY and CONTRACTOR agree that the terms "Agreement" and "Contract" and "Contract Documents" are used interchangeably in this Contract and the terms "Agreement" and "Contract" and "Contract Documents" each include all "Contract Documents."

In its Request for Proposals (or "RFP"), the City explained that the party selected to provide testing services would be required to indemnify the City for certain contract-related claims, and to obtain insurance to secure that indemnity obligation:

> The City's standard contract requires that the Contractor shall indemnify, defend and hold harmless the City and any of its agencies, officials, officers, or employees from and against all claims,

damages, liability, losses, costs, and expenses, including reasonable attorneys' fees, arising out of or resulting from any acts or omissions in connection with the contract, caused in whole or in part by Contractor, its employees, agents, or Subcontractors, or caused by others for whom Contractor is liable, including negligent acts or omissions of the City, its agencies, officials, officers, or employees. The contract requires Contractor to obtain specified limits of insurance to insure the indemnity obligation. **Contractor has the opportunity to recover the cost of the required insurance in the Contract Price by including the cost of that insurance in the Proposal.**

The City's "Standard City Contract" was provided to interested parties as part of the Request for Proposals. The Standard City Contract contained the following indemnity language in §§ 19(b) and (c):

(b)     CONTRACTOR'S obligations under this Section with respect to indemnification for acts or omissions, including negligence, of CITY, shall be limited to the coverage and limits of insurance that CONTRACTOR is required to procure and maintain under this Contract. CONTRACTOR affirms that it has had the opportunity to recover all costs of the insurance requirements imposed by this Contract in its contract price.

(c)     CONTRACTOR shall defend, indemnify and hold harmless CITY from and against all claims arising out of or resulting from all acts or omissions in connection with this Contract caused in whole or in part by CONTRACTOR or CONTRACTOR's Agents, regardless of whether or not caused in part by any act or omission, including negligence, of CITY. CONCTRACTOR is not obligated under this Section to indemnify CITY for the sole negligence of CITY.

In § 21, the Standard City Contract also contained the following specifications for the general liability insurance which the selected contractor would need to provide:

(a)     CONTRACTOR shall procure and maintain in effect throughout the term of this Contract insurance policies with

8

coverage not less than the types and amounts specified in this Section. CONTRACTOR must have:

1. Commercial General Liability Insurance Policy: with limits of $1,000,000 per occurrence and $2,000,000 aggregate, written on an "occurrence" basis. The policy shall be written or endorsed to include the following provisions:

a. Severability of Interests Coverage applying to Additional Insureds

b. Contractual Liability

c. Per Project Aggregate Liability Limit or, where not available, the aggregate limit shall be $2,000,000.

d. No Contractual Liability Limitation Endorsement

e. Additional Insured Endorsement, ISO form CG20 10, current edition, or its equivalent.

. . . .

(c) The Commercial General and Automobile Liability Insurance Policies specified above shall provide that CITY and its agencies, agents, officials, officers, and employees, while acting within the scope of their authority, will be named as additional insureds for the services performed under this Contract. CONTRACTOR shall provide to CITY at execution of this Contract a certificate of insurance showing all required endorsements and additional insureds.

Notably, the RFP specifically advised parties submitting proposals that they should notify the City if they desired clarification of the Request for Proposals, or of the City's proposed contractual language:

By submitting a Proposal to the City, Proposer certifies that Proposer has provided the City with written notice of all ambiguities, conflicts, mistakes, errors or discrepancies that Proposer has discovered in the RFP, the Proposed Contract, Scope of Services and any other document. By executing a Contract with the City, Proposer

9

certifies that Proposer communicated to City all ambiguities, conflicts, errors or discrepancies that it has discovered in the RFP, the Proposed Contract, Scope of Services and any other document and that written resolution thereof by the City as embodied in the final Contract is acceptable to Proposer.

The Standard City Contract contained a similar provision in § 22(b).

Concentra's proposal began with a two-page cover letter. The letter explained that, based on review by its legal department, the company had proposed modifications to the indemnity and insurance requirements contained in the City's Request for Proposals:

Concentra's Legal and Risk Department reviewed the terms and conditions and insurance requirements outlined in the City's RFP and made minor modifications to the language stated therein. We include these modifications with our response as **Attachment A – Legal Risk Modifications**. *If Concentra is the successful bidder, we want to engage in open dialogue with the City to discuss these suggested modifications, review the contract, and ultimately create an agreement that not only outlines the schedule of services, but also protects the business interests of both the City and Concentra.*

The bolded and italicized text was set off in contrasting colors in Concentra's cover letter.

Consistent with the City's invitation to identify ambiguities or mistakes in the Request for Proposals and proposed contract, Concentra's proposal suggested a modification to the RFP's indemnity paragraph, to delete the statement that the contractor would be required to indemnify the City for claims arising out of or resulting from "negligent acts or omissions of the City, its agencies, officials, officers, or employees." Further, Concentra proposed the following modifications to §§ 19(b) and (c) of the Standard City Contract, governing indemnification:

(b)    CONTRACTOR's obligation under this Section with respect to indemnification for acts and omissions, ~~including negligence, of City~~, shall be limited to the coverage and limits of insurance that CONTRACTOR is required to procure and maintain under this Contract.  CONTRACTOR affirms that it has had the opportunity to recover all costs of the insurance requirements imposed by this Contract in its contract price.

(c)    CONTRACTOR shall defend, indemnify, and hold harmless CITY from and against all claims arising out or resulting from all acts or omissions in connection with this Contract caused in whole or in part by CONTRACTOR or CONTRACTOR's Agents, ~~regardless of whether or not caused in part by any act or omission including negligence, of CITY.~~   CONTRACTOR is not obligated under this Section to indemnify CITY for the ~~sole~~ negligence of CITY.

In addition to proposing modifications to the indemnity language in the RFP and in the Standard City Contract, Concentra also included in its proposal a form of "Blanket Additional Insured" endorsement.  The attachment of this Blanket Additional Insured endorsement addressed the requirement in §§ 21(a)(1)(e) and 21(c) of the Standard City Contract, that the contractor include the City as an additional insured in its commercial general liability insurance policy, and that the policy contain an "Additional Insured Endorsement, ISO form CG20 10, current edition, *or its equivalent*."  (Emphasis added.)

Concentra's "Blanket Additional Insured" endorsement did not employ the language of ISO form CG20 10.  Instead, it provided:

5.    As respects Commercial General Liability Insurance, any person or entity named on a certificate of insurance Issued by or on behalf of the Named Insured Is an additional Insured, but only to the extent of such designation and ***only with respect to liability of the additional insured arising out of operations of the Named Insured.  Coverage is not provided under this policy for the acts or omissions of such person or entity*** or the acts or omissions of Its employees, agents or representatives.

11

(Emphasis added.)

The City's Request for Proposals made clear that proposals submitted by interested parties would be treated as contractual offers:

> By submitting a proposal to the City, Proposer agrees that Proposer's Proposal shall constitute a firm irrevocable offer to the City that Proposer shall not withdraw or modify without the City's approval for ninety (90) days after the proposal due date.  Proposer agrees that even if the City negotiates or makes a counter offer to Proposer on Proposer's original Proposal or any subsequent Proposal submitted by Proposer to the City, Proposer hereby grants to the City, in the City's sole discretion, the unconditional right for the City to accept Proposer's original Proposal and the City's negotiation or counter offer shall not be deemed to be a counter offer.

The RFP provided that, after ninety days, "the City can accept any proposal . . . with the consent of the Proposer."  The Request for Proposals specified that the City, "in its sole discretion," could choose to "accept any Proposal in whole or in part."

By including Concentra's proposal in the contract, without expressing any objection to any of the terms of that proposal, the City accepted Concentra's proposed modifications of the Standard City Contract, and the "Blanket Additional Insured" endorsement which Concentra provided to comply with §§ 21(a)(1)(e) and 21(c) of the Standard City Contract.  The only reasonable means to reconcile the inclusion of both the Standard City Contract, and Concentra's proposal, in "the Contract" is to conclude that the Standard City Contract is modified in the manner proposed by Concentra.  Indeed, the Standard City Contract itself stated, in § 22(b), that the City's "written resolution" of the contractor's requests for clarification of the contract documents would be

12

"embodied in the final Agreement" (a term which was defined to include *all* of the contract documents).

Moreover, although it disputes that Concentra's modifications to § 19 of the Standard City Contract became operative, the City offers no plausible argument against inclusion of Concentra's "Blanket Additional Insured" endorsement in the Contract, in compliance with § 21(a)(1)(e) (requiring an additional insured endorsement following a particular form prepared by the Insurance Services Office, "or its equivalent"). Section 19(b) of the Contract specifies that the Contractor's indemnity obligation "shall be limited to the coverage and limits of insurance that CONTRACTOR is required to procure and maintain under this Contract." Under Concentra's "Blanket Additional Insured" endorsement, coverage was provided to the City "only with respect to [the City's] liability . . . arising out of [Concentra's] operations"; coverage was <u>not</u> provided "for the acts or omissions of" the City itself.[1]

The City stresses that the parties *signed* the twelve-page "Standard City Contract," which contained the *unmodified* indemnification language, while Concentra's proposal was merely an unexecuted attachment to the Standard City

_____

[1]   The City complains that the circuit court's judgment referred to *other* provisions of Concentra's commercial general liability policy (including policy exclusions for intentional acts and for liability based on employment practices). The City points out that those other policy provisions were not included in Concentra's contract proposal, and therefore did not become part of the Contract. Further, there was no competent summary judgment evidence establishing if and when these other policy provisions were provided to the City, and if and how the City responded. We agree that reliance on *other* provisions of Concentra's insurance coverage was inappropriate on the current summary judgment record. The summary judgment record establishes, however, that the "Blanket Additional Insured" endorsement *was* submitted to the City as part of Concentra's proposal, and was thereby incorporated into the Contract. Reliance on the other insurance-policy provisions is unnecessary to sustain the judgment.

13

Contract. The City argues that the parties' execution of the unmodified Standard City Contract reflects their *rejection* of Concentra's proposed modifications to the indemnity language, or at worst creates an ambiguity in the agreement (which is required to be resolved in the City's favor under § 22(a) of the Contract). We cannot agree. Both the Standard City Contract, and Concentra's proposal, constitute components of Contract EV1227, and the City cites no provision of the Contract, and no legal authority, which would justify giving one component of the Contract greater force than another. The relationship between the two documents is easily understood: the Standard City Contract provides the bulk of the terms governing the parties' relationship; but that document is modified, in limited respects, by the language contained in Concentra's proposal, to which the City apparently raised no objection, and which it chose to include as part of "the Contract."

The situation is little different from an insurance policy which consists of a standard policy form and attached endorsements. The attached endorsements frequently modify, limit, or rescind provisions of the "base" policy form – without creating an ambiguity. *See, e.g., Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. 2007) ("Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable," even though they limit the coverage provided by a policy form's broad initial statement of coverage); *Johnson v. State Farm Mut. Auto. Ins. Co.*, 604 S.W.3d 875, 881 (Mo. App. S.D. 2020) (rejecting policyholder's argument that an endorsement's limitation of coverage which was provided in a form

insurance policy created an ambiguity, where the policy form clearly advised policyholders that the policy included "any endorsements that apply").

The City also relies on § 21(a)(1)(b) of the Standard City Contract, which required contractors to have commercial general liability policies which include coverage for "contractual liability."  The City argues that this provision required Concentra to have insurance coverage for the full extent of its contractual indemnity obligation as stated in § 19(c) of the contract.  The City did not preserve this argument in the circuit court, however.  Although Concentra's summary judgment briefing expressly relied on the "Blanket Additional Insured" endorsement it submitted as part of its proposal, the City never cited to, or argued the relevance of, § 21(a)(1)(b).  The City may not argue for reversal of the circuit court's summary judgment ruling based on arguments it did not make in the circuit court; we "will not convict a trial court of error on an issue that was never presented to the trial court for its consideration."  *Bracely-Mosley v. Hunter Eng'g Co.*, 662 S.W.3d 806, 821 (Mo. App. E.D. 2023) (citations and internal quotation marks omitted); *see also*, *e.g.*, *Fouts v. Regency N. Acquisition, LLC*, 569 S.W.3d 463, 466–67 (Mo. App. W.D. 2018).

We also note that the City has provided no evidentiary materials to demonstrate the commonly understood meaning or scope of "contractual liability" coverage.  On appeal, it cites only a single case involving a policy providing such coverage – and that case quotes the relevant policy language only in part.  The other cases the City cites involve contractual liability *exclusions*, which provide little guidance as to the scope and terms of contractual liability *coverage*.  Further, the City has provided no argument as to how any "contractual

15

liability" coverage Concentra was required to provide would interact with the limited coverage provided to the City, as an additional insured, under the "Blanket Additional Insured" endorsement which Concentra included in its proposal.

For the foregoing reasons, we conclude that Concentra's indemnity obligations are governed by §§ 19(b) and (c) of the Standard City Contract, *as modified in Concentra's proposal, and* by the terms of the "Blanket Additional Insured" endorsement Concentra submitted, and which the City accepted as part of the Contract. Under those documents, Concentra was only required to indemnify the City for "claims arising out of or resulting from all acts or omissions in connection with this Contract caused in whole or in part by CONTRACTOR or CONTRACTOR's Agents"; the Contract expressly provided that Concentra was "*not* obligated . . . to indemnify CITY for the negligence of CITY." (Emphasis added.) Moreover, under the additional insured endorsement incorporated into the Contract, the City is entitled to indemnity "only with respect to liability . . . arising out of [Concentra's] operations," and not "for the acts or omissions of" the City itself.

## II.

The circuit court correctly found that Concentra's indemnity obligation did not apply to the City's liability to Hazziez in the underlying litigation. The City's liability did not arise from "acts or omissions . . . caused in whole or in part by" Concentra, or "aris[e] out of [Concentra's] operations." Instead, the City's liability arose out of *its own* "acts or omissions" – liability explicitly excluded from the Contract's indemnity provisions.

16

At trial, after both the Concentra and eScreen defendants had settled, the City obtained the following limiting instruction over Hazziez's objections:

> Evidence has been presented concerning the acts of third parties who are neither defendant nor defendant's employees. You may not consider the acts of such third parties to be the acts of defendant.

During closing argument, Hazziez's counsel quoted the limiting instruction to the jury, but argued that the City had "chose[n] to use Concentra," "[a]nd the City is responsible if they chose the wrong parts for the [drug and alcohol testing] machine." The City's counsel objected, and the court admonished Hazziez's counsel to clarify, since the "[t]hey are not liable for the acts of third parties. They are liable for how they responded."

It is also significant that the four claims which Hazziez submitted to the jury (on two of which she prevailed) all depended on a single adverse employment action: the City's termination of her employment. This was a decision only the City, as Hazziez's employer, could make.

Our disposition of the City's appeal of the underlying judgment confirms that the City was held liable for *its own* actions, and not based on Concentra's actions. In the prior appeal, the City argued that it was entitled to a reduction of Hazziez's damages award, to reflect the settlements she had previously reached with the Concentra and eScreen defendants. We rejected the City's argument, on the basis that the City had not been held liable for "the same injury" allegedly resulting from Concentra's (or eScreen's) actions:

> The City not only opposed Ms. Hazziez's plea that the liability of all the defendants was joint and several, it also requested and received a jury instruction that stated, "Evidence has been presented concerning the acts of third-parties who are neither the Defendant

17

nor Defendant's employees.  You may not consider the acts of such third-parties to be the acts of Defendant." . . .  Neither the Concentra Defendants nor the eScreen Defendants could terminate Ms. Hazziez, and the City disavowed their alleged acts, which led to the termination, in defending the claims against it.  . . .  We agree that ***the elements of Ms. Hazziez's claims against the defendants are not the same and that the injuries or damages covered by the settlements do not overlap with the injuries she sustained as a result of the City's actions***.  Accordingly, the trial court did not err in refusing to reduce the award against the City by the amounts Ms. Hazziez received in settlement with the Concentra and eScreen defendants.

*Hazziez v. City of Kansas City*, Nos. WD82336, WD82363, WD83200 & WD83227, Memo. at 13-14, 606 S.W.3d 149 (Mo. App. W.D. 2020) (*mem.*) (emphasis added).  Our rejection of the City's claim for a reduction of the jury's verdict, based on the Concentra defendants' settlement with Hazziez, confirms that the City was held liable for *its own* actions, not the actions of Concentra.

In these circumstances, the claims for which the City was held liable did not "aris[e] out of or result[ ] from . . . acts or omissions . . . caused in whole or in part by" Concentra, and it is not the case that the City was subject "to liability . . . arising out of [Concentra's] operations."  The situation is analogous to that presented in *Nusbaum v. City of Kansas City*, 100 S.W.3d 101 (Mo. 2003).  In that case, the applicable indemnification provision stated that a subcontractor

> shall indemnify and hold harmless the [Contractor] from and against claims, damages, losses and expenses . . . arising out of or resulting from performance of the Subcontractor's work under this Subcontract, but only to the extent caused in whole or in part by negligent acts or omissions of the Subcontractor, . . . regardless of whether or not such claim, damage, loss, or expense is caused in part by a party indemnified hereunder.

*Id.* at 105-106. (By allowing indemnification for claims "caused in part by" the indemnitee, the indemnity provision at issue in *Nusbaum* is arguably *broader than* the provision at issue here.)

In *Nusbaum*, the Court held that the use of the phrase "to the extent caused" meant that the indemnitor's liability must be limited to that portion of fault attributable to the indemnitor:

> The preferred construction of the indemnification provision at issue, one that provides a reasonable meaning to each phrase of the provision, requires nothing more than that [Subcontractor] indemnify [Contractor] for [Subcontractor's] negligence even if [Contractor] participates in part in [Subcontractor's] negligent conduct. To hold otherwise would make the intended expression to limit liability to the acts of indemnitor meaningless.

*Id.* at 106-07.

The indemnity provision at issue in *Nusbaum* is not identical to the provision at issue here. In this case, the indemnity provision does not limit indemnity the "to the extent [claims are] caused" by the indemnitor's negligence. The indemnity language at issue here does, however, exclude indemnity for the City's negligence, or for its "acts or omissions," and provides indemnification "only with respect to liability . . . arising out of [Concentra's] operations." We believe a construction similar to the one adopted in *Nusbaum* is justified: that Concentra was required to indemnify the City for liability arising from Concentra's actions, but not liability resulting from the City's own conduct. In this case, the jury was told that it could only hold the City liable for its own actions, not vicariously for the actions of Concentra. Because the City's liability to Hazziez arose solely from its own actions, not in whole or in part from

19

Concentra's actions, the circuit court did not err in granting summary judgment to Concentra on the City's contractual indemnity claim.

**Conclusion**

The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.